# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**E. DAVIS COOTS**
**BRANDON ANN GIBSON**
Coots, Henke & Wheeler, P.C.
Carmel, Indiana

APPELLEE PRO SE:

**NEIL S. BIRKHIMER**
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LISA A. BIRKHIMER, | ) | |
| | ) | |
| Appellant-Petitioner/Cross-Appellee, | ) | |
| | ) | |
| vs. | ) | No.  29A02-1111-DR-1058 |
| | ) | |
| NEIL S. BIRKHIMER, | ) | |
| | ) | |
| Appellee-Respondent/Cross-Appellant. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Daniel J. Pfleging, Judge
Cause No. 29D02-0504-DR-383

**December 26, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Lisa Birkhimer filed a petition for legal separation from her husband, Neil Birkhimer, on April 25, 2005. Neil has historically been employed in high-paying financial management positions; however, at the time that this case was completed at the trial level, Neil was unemployed. Lisa co-owns a car dealership and several real estate holding companies with her brother. Lisa acquired her interest in these businesses from her father. Her interest in the holding companies was a gift, and she executed a promissory note for her interest in the dealership. Lisa works part-time for the dealership and receives a salary; she also receives periodic distributions from the family businesses, which she uses to pay taxes and make interest payments on the note to her father. Due mainly to the difficulty of valuing Lisa's business interests, discovery in this matter was complex, contentious, and protracted. The final hearing spanned seven days, beginning on July 20, 2010, and concluding on February 10, 2011. Each party presented testimony from multiple experts.

In its dissolution decree, the trial court valued all marital assets as of the date of separation, and the court adopted the values that Neil's experts proposed for Lisa's business interests. The court awarded Lisa 67% of the total marital estate, including her business interests. In order to effect the division, Lisa was ordered to make a substantial payment to Neil. The trial court adopted the parties' agreement that they would have joint custody of their children and exercise equal parenting time. The court ordered Lisa to pay child support to Neil and also ordered her to pay a portion of Neil's attorney's fees and litigation expenses.

After the decree was issued, each party made several motions. Lisa filed a motion to correct error, which was deemed denied, and also filed a motion to stay, which was granted. Neil requested security for the cash award, which was denied, and also requested additional attorney's fees for work done post-judgment and the anticipated appeal, which was granted.

Each party has appealed the dissolution decree, and Lisa also appeals the order requiring her to pay a portion of Neil's post-judgment and appellate attorney's fees. The parties each raise several issues, and we conclude that the following issues require remand to the trial court: (1) the trial court did not include Lisa's debt to her father in the marital estate; (2) the court allowed Lisa to deduct certain expenses from her income for child support purposes, but did not make findings supporting these deviations from the Child Support Guidelines; and (3) the parties both agree that because Lisa is responsible for paying the children's controlled expenses, the parenting time credit should be applied to Neil. Therefore, we affirm in part, reverse in part, and remand with instructions, which are outlined in the conclusion of this opinion.

**Facts and Procedural History**

The facts favorable to the judgment are as follows. Neil and Lisa were married on March 21, 1992. They lived in Dayton, Ohio; Seymour, Indiana; Henniker, New Hampshire; and Columbus, Indiana, before settling in Noblesville, Indiana, in 1997. Neil and Lisa have two daughters, J.B., born in 1996, and A.B., born in 1998.

The move to Noblesville was motivated at least in part by Lisa's desire to be near her family. Lisa's father, Ivan Gingerich, and her brother, Rex Gingerich were each 50% owners

of H.E. McGonigal, Inc., a car dealership ("the dealership") located in Kokomo.  Ivan and Rex also owned McGonigal Building Partnership ("MBP"), a real estate holding company. From these two companies, three subsidiary real estate holding companies were formed: Tority, Juliash, and Birkhimer.  After the move to Noblesville, Lisa started working ten to fifteen hours a week for the dealership, mainly performing human resources functions.  Neil got a job at Remy International.  Neil has a bachelor's degree in economics, an MBA, and a Series 7 license, and has been licensed as a certified public accountant and a certified manufacturing accountant.  He has held various positions with Remy, mostly involving financial management.

In 1999, Ivan became concerned that, in the event of his death, his children would have to sell the family businesses to pay the inheritance taxes.  After consulting an attorney about his estate plan, Ivan decided to gift his interest in MBP to Lisa.  Ivan also sold half of his shares of the dealership to Rex and half to Lisa.  The end result is that Lisa owns 25% of the dealership, 50% of MBP, 50% of Birkhimer, 25% percent of Tority, and 25% of Juliash; Rex owns the remaining shares of each of these companies.  Lisa signed a promissory note in the amount of $596,000 and makes monthly interest payments to Ivan in the amount of $3,383.33.  Ivan forgave $16,000 of the principal, and the entire principal will be forgiven in the event of Ivan's death.  The dealership is an S corporation and the real estate holding companies are limited liability corporations, all of which are taxed as pass-through entities. Lisa does not participate in the management of any of the family businesses, including the ones she owns equally with Rex.  Rex makes the business decisions and determines the

4

timing and amount of dividends. Rex regularly makes distributions in an amount sufficient to allow Lisa and himself to pay their taxes and the interest owed to Ivan. When the distributions exceed the amount that Lisa needs to pay these expenses, she places the funds in an account that is in her name alone.

On April 25, 2005, Lisa filed a petition for legal separation. Neil temporarily moved to an apartment, but then returned to the marital residence. Lisa moved into an apartment in January 2006. In July 2006, she purchased a residence approximately three blocks from the marital residence. Lisa makes mortgage payments on the new residence. The mortgage on the marital residence had been paid off in 2003, so Neil has not been making a mortgage payment.

In May 2007, Neil received notice from Firestone that the creek adjacent to the property on which the marital residence is located had been contaminated. Firestone performed environmental remediation work that included digging up a portion of the yard, putting down new sod, and planting trees. In addition, Firestone paid Neil a settlement of $62,000, which covered diminution of the value of the property and loss of enjoyment while the remediation work was in progress. The marital residence had been appraised at a value of $284,000 in 2006, before the contamination issue came to light. Neither party obtained a new appraisal afterwards.

In November 2008, the parties reached a partial settlement agreement, in which they agreed to joint physical and legal custody of the children and equal parenting time. The issue of child support was left unresolved.

Discovery in this case was complex and contentious. Due to the turmoil in the economy and especially the auto industry during the pendency of this case, the parties hotly disputed which date should be used to value Lisa's business interests. Lisa took the position that the businesses should be valued as of the date of separation, while Neil took the position that a more recent date should be used. Each approach posed difficulties, and each party hired multiple experts. Valuing the businesses as of the date of separation was difficult in that the experts had to use a retrospective analysis. Using later dates was difficult in that a number of changes occurred during the pendency of the case. For example, new properties were acquired, the dealership property was renovated, the dealership moved its Jeep inventory to a different dealership in exchange for a $2 million note, and the dealership acquired the Pontiac inventory from a dealership that had gone out of business.

Lisa retained Michael Lady to appraise the real estate owned by her family businesses using valuation dates of April 2005 and January 2009. Lisa referred Lady to Rex to get the information needed to complete his appraisals, and Rex neglected to inform Lady that MBP owned an empty lot along U.S. Highway 31 and that one of the properties had a truck terminal on it in April 2005 that had since been demolished; thus, Lady's appraisal reports initially omitted this information. Neil was aware that MBP owned the empty lot on U.S. Highway 31 because it had been mentioned at a family meeting. Neil also hired a real estate appraiser, Leo Lichtenberg, to review Lady's appraisals and to complete his own appraisals using valuation dates of April 25, 2005, and September 30, 2009. Lichtenberg discovered that one of the properties had had a truck terminal on it by reviewing tax records.

Lisa hired Bret Brewer to appraise the businesses as of April 2005 and December 2008. Neil hired John Sandlin to value Lisa's interest in the real estate holding companies and hired Carl Woodward and James Alerding to appraise the dealership as of April 2005, June 2008, and April 2010. Woodward testified that 2005 and 2010 were "typical" years for the dealership, but in 2008, the auto industry "fell off the cliff" and it was "the lowest period in many, many years." Tr. at 588, 594. Woodward and Alerding noticed that Brewer had misinterpreted the dealership's financial statements, which resulted in an omission of $2.5 million in inventory; Brewer issued revised appraisals after the mistake was called to his attention.

The parties' experts all testified at length about their own methodology and critiqued the methodology used by the other parties' experts. Lisa's experts valued her business assets at $2,786,400 in 2005, while Neil's experts valued those assets at $3,559,700 in 2005.

Lisa presented testimony from James Troutman, an accountant who has prepared taxes for the dealership for several years, has prepared taxes for the Birkhimers in the past, and continues to prepare Lisa's taxes. Troutman testified that Lisa and Neil started filing separately in 2004. Lisa informed him that Neil was going to claim the exemptions for both children. Troutman testified that in 2004, Lisa paid an additional $12,679 in taxes due to the decision to file separately; in 2005, she paid an extra $12,388. Troutman prepared an exhibit, admitted as Petitioner's Exhibit 28, which shows Lisa's gross income – consisting of wages, employer contributions to her 401(k), commissions, and distributions from the dealership – from 2004 through 2009, as well as estimates for 2010. The exhibit then shows Lisa's net

7

cash flow after paying all taxes, her mortgage, and the interest owed to her father. According to the exhibit, her average net cash flow during the pendency of the divorce has been about $109,000.

Lisa testified that she has a B.S. in accounting, but she has not done accounting work since before the move to New Hampshire. Since the return to Indiana, she has been continuously employed by the dealership, except for a short break when A.B. was born. Lisa typically works two days a week doing payroll work and running the company's wellness program. Her salary is $48,000 per year. Lisa also receives a vehicle from the dealership for her personal use. She currently drives a Yukon, and Rex testified that if that vehicle were being offered for sale, the monthly payment would be about $1065 per month. Lisa testified that Neil was the one who decided to file separate tax returns, and she did not question or oppose his decision.

In the past, Neil has taken some pay cuts and made lateral moves within Remy in order to have flex time so that he could spend more time with his daughters. Although he had earned more earlier in his career, at the time of the final hearing, Neil's weekly gross income was $1917.30.

The final hearing was held on July 20-22, 2010; September 29-30, 2010; October 14, 2010; and February 10, 2011. The trial court issued the dissolution decree on August 9, 2011. The court incorporated the parties' November 2008 partial settlement agreement regarding custody and parenting time. For child support purposes, the court found that Neil's weekly gross income was $1917.30. Relying in part on Lisa's Exhibit 28, the court found

8

that Lisa's weekly gross income was $2342. The court rejected the child support obligation worksheets ("CSOW") prepared by each party and created its own. The court applied the parenting time credit to Lisa and concluded that she should pay Neil $77.59 per week in child support. The court also ordered Lisa to pay the children's fixed expenses.

At the beginning of the hearing, the parties stipulated to the value of most of their assets other than Lisa's business interests. The trial court chose 2005 as the valuation date for all marital assets. The court awarded the business interests to Lisa, but used the values proposed by Neil's experts. The debt to Lisa's father was also assigned to Lisa. Neil received the marital residence and the Firestone settlement payment. Each party received some personal property and financial accounts. After a thorough consideration of the statutory factors, the court concluded that deviation from an equal division was just and reasonable and awarded 33% of the marital estate to Neil and 67% to Lisa. In order to effect this division, the court ordered Lisa to pay $870,948.47 to Neil in equal monthly payments over ten years, with interest. The court also ordered Lisa to pay a portion of Neil's attorney's fees and litigation costs.

On September 8, 2011, Lisa filed a motion to correct error. Neil filed a response on September 22, 2011. On September 29, 2011, Lisa filed a motion to stay, which Neil responded to on October 6, 2011. Lisa's motion to correct error was deemed denied on October 24, 2011. The trial court held a hearing on Lisa's motion to stay on November 22, 2011. At that time, Neil filed a motion requesting post-judgment and appellate attorney's

fees. Lisa objected to Neil's motion, arguing that the trial court lacked jurisdiction to entertain the motion. The court asked the parties to submit briefs on the issue.

On December 27, 2011, the trial court held an evidentiary hearing on Neil's motion. Neil testified that his employer informed him that his flex time would be eliminated, that he would have to work more than forty hours a week, and that his job duties would be "undetermined." Tr. of Hearing on Pending Motions at 64.[1] Alternatively, Neil was given the option to resign and accept a separation package that included six month's pay. Neil chose to take the separation package and received his final payment at the end of 2011. Neil testified that he was not looking for work at that time "[b]ecause my job is going to be out there. I'm not worried about getting employment. The most important thing to me right now is to get through this process of the divorce." *Id*. at 38. Neil testified that he had liquidated several assets, had accrued credit card debt, and had taken out a personal loan.

Lisa testified that she had also depleted her cash accounts. She testified that her distributions in 2011 had not exceeded her interest and tax payments. She also stated that the dealership had required her to make a capital contribution of $50,000.

On December 29, 2011, the trial court granted Lisa's motion to stay and set a bond. On January 20, 2012, the trial court issued an order on Neil's motion. The court noted the work that counsel had performed for Neil post-judgment, including responding to Lisa's motions and appearing at hearings. The court ordered Lisa to pay $3750 toward Neil's post-

---

[1] The transcript of the final hearing consists of six consecutively paginated volumes. The November 22 and December 27, 2011 hearings are transcribed in a separate volume titled "Transcript of Hearing on Pending Motions."

judgment attorney's fees. In addition, the court ordered Lisa to pay half the cost of the transcript and $15,000 toward Neil's appellate attorney's fees.

Both parties have appealed the divorce decree, and Lisa also appeals the trial court's order of January 20, 2012. Each party filed a notice of appeal, and the cases have been consolidated under this cause number with Lisa designated as the appellant/cross-appellee and Neil designated as the appellee/cross-appellant.[2]

## Discussion and Decision

The trial court issued findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). Our standard of review is well-settled:

> First, we must determine whether the evidence supports the trial court's findings of fact. Second, we must determine whether those findings of fact support the trial court's conclusions of law. We will set aside the findings only if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.
>
> In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. To make a determination that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made.

---

[2] Neil filed a notice of appeal on September 7, 2011, before the filing of Lisa's motion to correct error had been entered on the chronological case summary. Neil's appeal was assigned case number 29A02-1109-DR-827. Lisa filed a notice of appeal on November 23, 2011, after her motion to correct error was deemed denied. Her appeal was assigned case number 29A02-1111-DR-1058. On January 30, 2012, these appeals were consolidated under case number 29A02-1111-DR-1058. After the trial court issued its order awarding Neil additional fees, Lisa filed a second notice of appeal, which was assigned case number 29A04-1202-DR-84. On March 2, 2012, we consolidated Lisa's second appeal with the existing appeal under case number 29A02-1111-DR-1058.

11

*Hartley v. Hartley*, 862 N.E.2d 274, 281 (Ind. Ct. App. 2007) (quoting *Gregg v. Cooper*, 812

N.E.2d 210, 214-15 (Ind. Ct. App. 2004), *trans. denied*).

Each party raises several issues on appeal.[3]  Because some of the issues are inter-

related, rather than addressing the appeal and cross-appeal issues separately, we will first

address all issues relating to property division, then the issues relating to child support, and

then all remaining issues.

### I.  Property Division

### A.  Valuation Date

The trial court has broad discretion in determining the value of property in a

dissolution action, and its valuation will not be disturbed absent an abuse of discretion.

*Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996).  The trial court may value the marital

---

[3] Lisa raises five distinct issues, which she states as:  (1) the trial court erred by giving Neil the credit for controlled expenses on the CSOW despite finding that Lisa should pay for the controlled expenses; (2) the trial court's findings do not support any award of attorney's fees to Neil and the trial court abused its discretion in ordering Lisa to pay 33% of Neil's attorney's fees and litigation expenses; (3) the trial court erred by not including Lisa's $580,000 debt when dividing the marital estate; (4) the trial court's division of the marital estate and order requiring Lisa to pay $870,948.47 to Neil is not supported by its findings; and (5) the trial court abused its discretion by awarding post-judgment and appellate attorney's fees to Neil when the parties have similar resources and Neil is voluntarily unemployed.  Appellant's Br. at i.

Neil raises seven issues, which he states as:  (1) the approval, merger, and incorporation of Neil and Lisa's "Partial Settlement Agreement Regarding Custody and Parenting Time" in the decree was clearly erroneous due to significant deficiencies in the trial court's attempt to incorporate the previously approved agreement; (2) the trial court abused its discretion by selecting April 30, 2005, as the valuation date for H.E. McGonigal, instead of choosing April 30, 2010; (3) the trial court, through plain error or abuse of discretion, distributed the marital estate in a manner that was not just and reasonable; (4) the trial court abused its discretion by not providing any security, after the completion of the appeal, on the distribution payment or fee award ordered to be paid to Neil by Lisa; (5) the trial court "made clear error" by limiting Neil's and Lisa's claims and rights beyond the trial court's jurisdiction and authority; (6) the trial court's net cash flow figure for Lisa of $109,000 used in calculating child support is clear error; and (7) the trial court needs to fully address the content of its judgment, pursuant to Indiana Trial Rule 58(B).  Appellee's Br. at ii-iii.  Neil's third issue is broken into several subsections, in which he identifies some scrivener's errors in the dissolution decree and argues that the marital estate should have been divided equally.  Neil abandons the seventh issue in his reply brief; therefore, we will not address it.  *See* Cross-Appellant's Reply Br. at 21 (Neil states that he "waives this argument").

assets as of "any date between the date of filing the dissolution petition and the date of the hearing." *Id.* Neil argues that the trial court erred by selecting April 25, 2005, as the valuation date for Lisa's business interests because that was the date that Lisa petitioned for legal separation, not dissolution.

Lisa argues that Neil waived this argument by not raising the issue in the trial court. In fact, Neil asked the trial court to value certain assets as of April 25, 2005, and his proposed order stated that, pursuant to Indiana Code Section 31-9-2-46, the court "may use any date between the Separation Date and the date disposition of the property is effective to

value an asset."[4]  Appellee's App. at 364.  Thus, we agree with Lisa that Neil waived his

argument that April 25, 2005, was not a valid date for valuing assets.  *See Grathwohl v.*

*Garrity*, 871 N.E.2d 297, 302 (Ind. Ct. App. 2007) ("If a party does not present an issue or

argument to the trial court, appellate review of the issue or argument is waived.").

### B.  Lisa's Debt to Ivan

Lisa argues that the trial court erred by not including her debt to Ivan when dividing

the marital estate.  In paragraph 55 under the heading "Property Issues," the court found that

---

[4] Indiana Code Section 31-9-2-46 states:

"Final separation", for purposes of IC 31-15-7, means the date of filing of the petition for dissolution of marriage under IC 31-15-2-4 (or IC 31-1-11.5-3 before its repeal). However, if:

(1) a legal separation proceeding involving the parties was pending when the petition for dissolution of marriage under IC 31-15-2-4 (or IC 31-1-11.5-3 before its repeal) was filed; or

(2) a provisional order or final decree for legal separation of the parties was in effect when the petition for dissolution of marriage under IC 31-15-2-4 (or IC 31-1-11.5-3 before its repeal) was filed;

the term means the date that the petition for legal separation was filed under IC 31-15-3-4 (or IC 31-1-11.5-3 before its repeal).

On January 19, 2006, Lisa filed a verified motion to amend petition for legal separation to petition for dissolution of marriage.  The motion was granted on January 20, 2006.  On February 13, 2006, Lisa filed a motion to strike the January 20 order and issue a reworded order.  An order granting Lisa's motion and setting a preliminary hearing was signed on February 23 and filed on February 27, 2006.  Neil argues that this order was issued by a judge pro tempore who had not been properly appointed, and the order therefore did not effectively cause the petition for dissolution to relate back to the date of filing the petition for legal separation. It does not appear that Neil challenged the validity of this order at any time prior to this appeal, nor does he indicate how he was prejudiced by any defect in the order.  *See* Ind. Trial Rule 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").  Had he called the issue to the court's attention, the court could have issued a new order remedying any defect, and this new order would still relate back to the date of separation pursuant to Indiana Code Section 31-9-2-46.  Therefore, we conclude that this argument is waived.  *See Robles v. State*, 705 N.E.2d 183, 187 (Ind. Ct. App. 1998) (an issue is waived if not raised in the trial court because trial court should be given opportunity to promptly correct the alleged error).

14

Lisa "is indebted to her Father, Ivan Gingerich, in the amount of $580,000 plus interest at the annual rate of 7% which debt shall be set over to Lisa." Appellant's App. at 39. In the section of the order titled "Decree of Dissolution of Marriage," the court sets out a chart listing thirty items of property, their value, and the party to whom each asset is awarded.[5] Lisa's 25% share of the dealership is valued at $1,400,000, and the debt is listed as "$0.00." *Id.* at 45. The $580,000 debt does not appear anywhere in the chart. The court's 33/67 split is based on the values listed in this chart.

"It is well-established that all marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts." *Smith v. Smith*, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010) (citing Ind. Code § 31-15-7-4(a)). Marital property includes both assets and liabilities. *Id.* "The trial court has no authority to exclude or set aside marital property but must divide all property." *Id.*

Lisa is correct that the debt to her father should be included in the marital estate. Neil argues that Lisa invited the error because the trial court adopted paragraph 55 and the chart from Lisa's proposed order. Nevertheless, it is clear that the trial court was aware of the debt

---

[5] Earlier in the order, in paragraph 4(e) under the heading "Conclusions of Law," the trial court sets out a chart containing Lisa's proposed values and a chart containing Neil's proposed values. Appellant's App. at 42-43. The court introduces Lisa's chart by stating, "Using Lisa's values and the division of marital property as agreed by the parties (i.e. which asset goes to which party) the distribution *shall* be as follows." *Id.* at 41 (emphasis added). After setting out Neil's chart, the order states, "The Court *adopts Neil's values*." *Id.* at 44 (emphasis added). The chart contained in the section titled "Decree of Dissolution of Marriage" uses some of Lisa's values and some of Neil's and includes the court's calculation of the 33/67 split. The intent of paragraph 4(e) appears to be to set out the parties' arguments, whereas the final chart appears to be the court's ruling; however, as Neil points out in his appellee's brief, paragraph 4(e) contains some contradictory language. On remand, the court should clarify paragraph 4(e).

15

and knew that it needed to be distributed. Therefore, we remand with instructions to include the debt in the chart setting forth the marital assets. Based on the chart, it appears that the trial court reached the decision to divide the marital assets 33/67 without considering the impact of Lisa's debt. After including Lisa's debt, the trial court may determine that a different division is just and reasonable. *See Miller v. Miller*, 763 N.E.2d 1009, 1012 (Ind. Ct. App. 2002) ("Because it will likely upset the division of property equation, the adjustment of one asset or liability may require the adjustment of another to avoid an inequitable result or may require the reconsideration of the entire division of property.").

Because of our resolution of this issue, we do not reach Neil's argument that the court should have divided the marital estate equally or Lisa's argument that she should receive a percentage of the estate large enough to eliminate the need to make a monetary payment to Neil.[6] However, we point out that the trial court thoroughly considered all the statutory factors in reaching its conclusion that the presumption in favor of an equal division had been rebutted. *See* Ind. Code § 31-15-7-5 (establishing a presumption that an equal division is just

---

[6] Neil also points out that there is a typographical error in the final paragraph of the order, which states that Lisa is to "pay Neil the sum of $870.948.47." Appellant's App. at 46. We presume that this mistake will be rectified when the court recalculates the property division.

16

and reasonable and setting forth factors that may be considered to rebut the presumption).[7]

On the other hand, those findings do not dictate that Lisa *must* receive the full value of all the

assets assigned to her without making a payment to Neil.

## II.  Child Support

### A.  Calculation of Lisa's Income

The trial court made the following findings regarding Lisa's income:

5.  Lisa's W-2 income for the calendar year 2010 was $48,000 ($923 per week).  In addition to Lisa's W-2 income, Lisa received the use of a "demo" automobile from the HE McGonigal, Inc. Dealership valued at $1,065.00 per month ($245 per week).

6.  Lisa periodically receives irregular income in the form of dividends paid by HE McGonigal, Inc.  Such irregular income is disclosed on Lisa's annual 1040 Federal Tax Return.  While the amount of Lisa's irregular income varies from year to year, the net average was $61,000.00 per year during the pendency of this divorce action.  When this amount is added to her $48,000.00 per year and the income derived due to the demo automobile, she received an average annual income computed by Doug Troutman on Exhibit 28.

Appellant's App. at 24.

Petitioner's Exhibit 28, prepared by Lisa's accountant, Doug Troutman, is titled "Lisa

Birkhimer Cash Flow."  The exhibit first shows Lisa's total cash inflow, consisting of W-2

wages, employer contributions to her 401(k), commissions, and distributions from the

---

[7] Neil argues that the trial court misapplied the second of these factors, the extent to which the property was acquired by each spouse before the marriage or through inheritance or gift. Ind. Code § 31-15-7-5.  In paragraph 50(d) under the heading "Property Issues," the court stated that "Lisa received a 25% interest in HE McGon[ig]al, Inc. from her father in calendar year 2000 as a part of his estate plan."  Appellant's App. at 37.  Neil argues that the court implied that Lisa's interest in the dealership was a gift.  The same paragraph, however, acknowledges that Lisa executed a note for $580,000 and that she pays interest on this amount.  While Lisa's acquisition of a share of the dealership was not strictly a gift, the court highlighted aspects of the transaction that were more generous than an arms-length transaction likely would have been, such as the fact that the principal is forgiven in the event of Ivan's death.  We do not agree that the trial court misstated the evidence or misapplied this factor.

17

dealership. The exhibit then shows cash outflows, including FICA and Medicare withholding, federal and state income tax withholding, quarterly estimated state and federal taxes due on the family businesses, interest paid to Ivan, and "Itemized Deductions," which Troutman testified included expenses such as Lisa's mortgage payments and real estate tax. Pet. Ex. 28. Troutman then subtracted the outflows from the inflows to arrive at a net cash flow figure for each year from 2004-2009, as well as an estimate for 2010. To calculate Lisa's irregular income, it appears that the trial court used years 2005-2010, averaged them, and subtracted $48,000.

Neil argues that the trial court's calculation artificially deflates Lisa's income. First, Exhibit 28 deducts all of Lisa's taxes from her income. The Indiana Child Support Guidelines, however, call for the use of gross income:

> One of the policy decisions made by the Judicial Administration Committee in the early stages of developing the Guidelines was to use a gross income approach as opposed to a net income approach. Under a net income approach, extensive discovery is often required to determine the validity of deductions claimed in arriving at net income. It is believed that the use of gross income reduces discovery. (See Commentary to Guideline 3A). While the use of gross income has proven controversial, this approach is used by the majority of jurisdictions and, after a thorough review, is considered the best reasoned.

> The basic support obligation would be the same whether gross income is reduced by adjustments built into the Guidelines or whether taxes are taken out and a net income option is used. A support guideline schedule consists of a column of income figures and a column of support amounts. In a gross income methodology, the tax factor is reflected in the support amount column, while in a net income guideline, the tax factor is applied to the income column. In devising the Indiana Guidelines, an average tax factor of 21.88 percent was used to adjust the support column.

> Of course, taxes vary for different individuals. This is the case whether a gross or net income approach is used. Under the Indiana Guideline, where taxes

18

vary significantly from the assumed rate of 21.88 percent, a trial court may choose to deviate from the guideline amount where the variance is substantiated by evidence at the support hearing.

Ind. Child Support Guideline 1, cmt. Thus, the trial court not only deviated from the guidelines, but because a tax rate of 21.88% is built into the Guidelines, the court also reduced Lisa's income by more than 100% of her taxes.

Second, Exhibit 28 deducts Lisa's payments to Ivan – a debt that is part of the marital pot – as well as her mortgage payments and real estate taxes. These are not items that are normally used to offset a child support obligation.

Distributions from the family businesses make up the lion's share of Lisa's income. Lisa's business interests result in a substantial tax liability, and she depends upon dividends from the business to pay her taxes, but she does not hold a controlling interest in any of the companies. Calculating irregular income presents a particular challenge for the trial court, *see* Ind. Child Support Guideline 3, cmt. 2(b), and this may well be a case where a deviation is warranted. However, deviations must be supported by written findings. Ind. Child Support Rule 3. The trial court's findings do not specifically address why Lisa was allowed the deductions included in Exhibit 28. On remand, the trial court shall recalculate Lisa's income. If a deduction is made for her taxes, the deduction should not exceed 100% of her taxes. The court shall enter written findings to support any deviations from the Guidelines.

### B. Parenting Time Credit

Lisa argues that the trial court erred in its application of the parenting time credit. The trial court rejected the CSOWs proffered by each party and created its own. The trial court

gave Lisa a parenting time credit based on 182 overnights, which resulted in Lisa owing

$77.59 per week in child support. In the order, the trial court stated:

> Given that the parties share physical custody and therefore have equal parenting time, this Court must determine which party shall receive the overnight parenting time credit and which party shall pay the controlled expenses. Neil proposed Lisa pay the controlled expenses. Lisa did not present a proposal. The evidence was that the common practice was that Wife had been paying more expenses that would be considered controlled expenses. The Court finds Wife shall receive the overnight parenting time credit and Wife shall pay the controlled expenses, clothing, education, school books and supplies, and personal care of the children, and the first Six Percent (6%) of uninsured healthcare expenses.

Appellant's App. at 25-26. Thus, the trial court cited evidence that would support assigning

controlled expenses to Lisa, but then also ordered her to pay child support, offset by the

parenting time credit.

Lisa argues, and Neil concedes, that the parenting time credit should not go to the

party paying the controlled expenses. *See* Ind. Child Support Guideline 6, cmt. (stating that

"controlled expenses are not shared and remain with the parent that does not get the parenting

time credit" and that in cases where parenting time is equally divided, "either the mother or

father must be designated as the parent who will pay the controlled expenses. Then, the other

parent is given the parenting time credit."). Lisa and Neil agree that Lisa should pay the

controlled expenses and Neil should receive the parenting time credit. *See* Appellant's Br. at

14 ("[T]he child support order should be set aside and recalculated based on Lisa receiving

the credit for controlled expenses and Neil receiving the credit for parenting time.");

Appellee's Br. at 11 ("The support calculation should reflect that Lisa is the designated

parent paying controlled expenses as per the court's findings. According to the guidelines,

Neil should get the parenting time credit.").  On remand, the trial court should complete a new CSOW using Lisa's recalculated income and assigning the parenting time credit to Neil.[8]

### III.  Incorporation of Partial Settlement

In its order, the trial court incorporated the parties' partial settlement agreement, which concerned custody and parenting time, with the following language:  "The parties shall share joint legal and physical custody of the children and the Court incorporates the Partial Settlement Agreement filed by the parties November 21, 2008."  Appellant's App. at 46. Neil argues that this language is insufficient to give binding legal effect to the partial settlement agreement.

First, Neil argues that this language does not identify the partial settlement agreement clearly enough because the title on the document is "Partial Settlement Agreement Regarding Custody and Parenting Time" and it was signed by the parties on November 17, 2008.  Neil argues that this is important because "there were two previous agreements which also addressed custody and parenting time."  Appellee's Br. at 26.  Our review of the record leads us to the conclusion that there is no real confusion as to which document the trial court was referencing.  The chronological case summary ("CCS") entry for November 21, 2008, states, "Partial Settlement Agreement Regarding Custody and Parenting Time entered.  Signed 11/20/08 and entered 11/21/08."  Appellant's App. at 8.  The two previous agreements that Neil refers to are a "Provisional Agreed Entry" stamped May 6, 2005, and an "Agreed Entry"

---

[8]  We note that if the court increases Lisa's income, application of the parenting time credit to Neil could result in a negative support obligation for Neil.  If that is the case, it may be appropriate for the court to order Lisa to pay child support to Neil.  *See Grant v. Hager*, 868 N.E.2d 801, 802-04 (Ind. 2007).

stamped December 1, 2006. Appellee's App. at 26, 31. Neither of these agreements is referred to as a partial settlement agreement, and neither of them bears any relationship to the date of November 21, 2008. Furthermore, neither party contends that the trial court should have incorporated or intended to incorporate a document other than the "Partial Settlement Agreement Regarding Custody and Parenting Time."

Neil's second point of contention is that the trial court's order did not state that the partial settlement agreement was "fully approved, merged, and incorporated" into the divorce decree. Appellee's Br. at 27. None of the cases cited by Neil persuades us that the trial court must use this "magic language" in order to make a settlement agreement binding. Neil relies on *In re Marriage of Pond*, 676 N.E.2d 401 (Ind. Ct. App. 1997), *trans. granted*, 700 N.E.2d 1130 (Ind. 1998); *Anderson v. Anderson*, 399 N.E.2d 391 (Ind. Ct. App. 1979); and *Grace v. Quigg*, 150 Ind. App. 371, 276 N.E.2d 594 (1971). The issue in *Pond* was whether the parties' agreement should be construed as an antenuptial agreement or a postnuptial agreement. *Anderson* and *Grace* were both cases where the parties had entered a settlement agreement, but the court did not reference the agreement in the dissolution decree at all. None of these cases holds that the trial court must use particular language in order to give binding effect to a settlement agreement. Notably, *Grace* did not use the "approved, merged, and incorporated" language that Neil insists is necessary; the *Grace* court stated that the agreement "would only be binding if it were *included and approved* by the court in the final decree." *Grace*, 150 Ind. App. at 599, 276 N.E.2d at 379 (emphasis added).

22

In this case, it is clear that the trial court approved the partial settlement agreement; it would not have incorporated the agreement if it did not approve of it. In this context, the words "merge" and "incorporate" have similar meanings. *See* BLACK'S LAW DICTIONARY 781, 1009 (8th ed. 2004) (defining "incorporate" as "[t]o combine with something else," and defining "merger" as "[t]he act or an instance of combining or uniting"). Neil's argument promotes form over substance, and we see no basis or need for the highly formulaic rule proposed by Neil. We conclude that the trial court's incorporation of the partial settlement agreement was sufficient.

### IV. *Discharge and Satisfaction of Claims*

Paragraph 3 of the court's order under the heading "Decree of Dissolution of Marriage" states: "The obligations imposed upon the parties by this Decree shall be in complete discharge and satisfaction of all claims and rights which either ever had, now has or might hereafter have against the other by reason of their former relationship as Husband and Wife." Appellant's App. at 46. Neil believes that this paragraph exceeds the court's jurisdiction, and he provides a list of hypothetical claims that he believes would be barred by paragraph 3, including "liability to former spouse for electronic surveillance violation," "liability to former spouse for torts," "ability to challenge former spouse's fraud on the court in dissolution of marriage proceedings," assertion of the "privilege of communication between husband and wife," "filing contempt or collection proceedings should Lisa fail to fulfill her financial obligations to him under the decree," "seeking attorney fee reimbursement for defending tax audits and claims arising out of the marriage relating to

23

Lisa's famil[y's] business dealings," and "contesting any bankruptcy filing … that seeks to discharge Neil's decree awards for money distributions and attorney and expert fee reimbursements." Appellee's Br. at 49-51.

We do not believe that paragraph 3 is as broad as Neil interprets it to be. Paragraph 3 applies only to claims "against the other by reason of their former relationship as Husband and Wife." Appellant's App. at 46. If, for example, Lisa commits a tort against Neil in the future, that claim would not be barred just because Lisa is Neil's ex-wife; such a claim would not be "by reason of their former relationship." Neil does not identify any existing claims that have been improperly extinguished by the language of paragraph 3. We agree with Lisa that our courts have long taken the approach that a dissolution decree should address all property issues. *See*, *e.g.*, *Draime v. Draime*, 132 Ind. App. 99, 104, 173 N.E.2d 70, 73 (1961) ("A decree of divorce not only terminates the marital obligations of the parties involved, but settles *all* property rights growing out of the marriage relationship."). Neil has not persuaded us that paragraph 3 exceeds the trial court's jurisdiction.

### V. Attorney's Fees

In dissolution cases, the trial court is statutorily authorized to award attorney fees:

> The court periodically may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this article and for attorney's fees and mediation services, including amounts for legal services provided and costs incurred before the commencement of the proceedings or after entry of judgment.

Ind. Code § 31-15-10-1.

> We review a trial court's award of attorney fees in connection with a dissolution decree for an abuse of discretion. The trial court abuses its

24

discretion if its decision is clearly against the logic and effect of the facts and circumstances before it. When making such an award, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and other factors that bear on the reasonableness of the award.

*Hartley v. Hartley*, 862 N.E.2d 274, 286 (Ind. Ct. App. 2007) (citations omitted). The court may also consider whether a party has committed misconduct that results in additional litigation expenses. *Mitchell v. Mitchell*, 875 N.E.2d 320, 325 (Ind. Ct. App. 2007), *trans. denied* (2008).

### A. Trial Attorney's Fees and Costs

Lisa argues that the trial court abused its discretion by ordering her to pay a portion of Neil's trial attorney's fees and costs because Neil has a higher earning ability; she has a mortgage payment, and Neil does not; and she uses her dividend income to pay interest on her debt to her father. However, Lisa's own cash flow exhibit (Exhibit 28), shows that even with these expenses, her average net income exceeds Neil's gross income.

Next, Lisa argues that Neil dissipated assets by filing separate tax returns and claiming the exemptions for both children, which increased Lisa's tax liability. While the trial court took note of these facts, it did not explicitly find that it was unreasonable for Neil to file separately. Lisa's own testimony reflects that she did not question or oppose Neil's decision to file separately. The court addressed the issue of Neil claiming both children by allowing Lisa to claim both children in 2011 and 2012; thereafter, the court ordered each party to claim one child.

Lisa also argues that the trial court should have taken into account that Neil spent much more on attorney's fees and litigation costs than she did. Discovery in this case was extremely contentious, especially as it related to valuation of Lisa's business interests. Neil filed multiple motions to compel, which Lisa contested. It appears that the trial court granted at least two of Neil's motions and that the issue of attorney's fees relating to these motions was still under advisement at the time of the final hearing.[9] We note that Neil's experts discovered a significant error in Brewer's appraisal of the dealership; Lisa's interest in the dealership would have been undervalued had Neil not hired experts to review Brewer's work. Neil and his experts also discovered some omissions in the real estate appraisals. Ultimately, the trial court adopted the valuations proposed by Neil's experts for each of Lisa's business interests.

Next, Lisa argues that any attorney's fee award to Neil should be offset by the $62,000 Firestone settlement, which Neil applied toward his attorney's fees. Neil testified that the settlement consisted of two parts: payment for loss of use and enjoyment of the property while Firestone was working on decontaminating the yard and payment for the decrease in market value of the property. The marital residence was appraised as of January 10, 2006.

---

[9] Lisa asserts that she was "forced to file at least five motions to quash and requests for protective orders during the proceedings, and the trial court granted all but one of the same." Appellant's Reply Br. at 31. It is difficult for us to reconstruct precisely what happened because a number of the CCS entries reflect only that an order was issued and do not state whether the motion was granted or denied, and the parties' appendices do not include all of the discovery-related filings and orders. From the record before us, we are able to discern that Lisa filed at least five motions to quash, and at least three of them were granted. Neil has provided copies of two court orders, one dated April 8, 2010, and one dated June 17, 2010, both of which grant motions to compel that had been filed by Neil. In addition, there is an order dated July 9, 2010, ordering Rex to respond to questions that Lisa objected to during his deposition.

The residence was determined to have a value of $284,500 at that time; however, the contamination issue had not yet come to light. In its distribution of property, the trial court adopted the $284,500 value; thus, it is only fair that the payment for the decrease in market value be set over to Neil rather than used to offset his fee award. As to the payment for loss of use and enjoyment of the property, Lisa was not living in the home at the time that Firestone was doing the remediation work. As the loss was specific to Neil, it is also fair that that portion of the settlement be set over to Neil rather than used to offset his fee award. The fact that Neil happened to use the Firestone settlement to pay attorney's fees – as opposed to some other source of funds – does not dictate that the settlement must offset the fee award.

Finally, Lisa notes that paragraph 57 under the heading "Property Issues" says that "Lisa is to pay 67% of Neil's litigation expenses and attorney fees." Appellant's App. at 40. However, in paragraph 5 under the heading "Decree of Dissolution of Marriage," the court says that Lisa shall "reimburse Neil for 33% of his litigation expenses and attorney fees within 90 days of this order." *Id.* at 36. Neil argues that the trial court meant that Lisa is to pay a total of 67% of his litigation expenses and attorney's fees and that a portion of that amount, 33%, must be paid within ninety days. However, if Neil is correct, the court's order does not appear to indicate when the remaining 34% should be paid. We conclude that the evidence supports an award of attorney's fees and litigation costs to Neil; however, on remand the trial court should clarify the amount to be paid and the timing of the payment.

27

### B. Post-Judgment and Appellate Attorney's Fees

Lisa also argues that the trial court abused its discretion by ordering her to pay a portion of Neil's post-judgment and appellate fees.[10] Lisa makes many of the same arguments addressed above and also notes that as of the hearing on Neil's motion for post-judgment and appellate fees, Neil was voluntarily unemployed.

In making the fee award, the court found that Lisa had caused Neil to incur additional attorney's fees after the dissolution decree was entered. Specifically, the court noted that Neil's counsel filed responses to Lisa's motion to correct error and motion for stay, appeared at hearings, submitted proposed orders, and briefed a jurisdictional issue raised by Lisa. Although Neil's decision to remain unemployed for a period of time has contributed to the depletion of his liquid assets, so did Lisa's successful motion to stay the trial court's dissolution decree, which ordered her to pay Neil $870,948.47 plus interest over the next ten years. Lisa has not persuaded us that the trial court abused its discretion by awarding Neil a portion of his post-judgment and appellate attorney's fees.

### VI. Security

Finally, we address Neil's argument that the trial court abused its discretion by not ordering Lisa to provide security for the cash award to Neil. Pursuant to Indiana Code Section 31-15-7-8, when a court issues an order dividing marital property, "the court may provide for the security, bond, or other guarantee that is satisfactory to the court to secure the

---

[10] The trial court also ordered Lisa to reimburse Neil for half the cost of the transcript in light of the fact that both parties anticipated appealing portions of the dissolution decree and would each use the transcript. It does not appear that Lisa challenges this portion of the order.

division of property." We have said that the "statutory language obviously affords the court the broadest possible discretion in requiring security" and that "we will not substitute our judgment for that of the trial court." *In re Marriage of Davis*, 182 Ind. App. 342, 350, 395 N.E.2d 1254, 1259 (1979).[11]

In *Davis*, one of just a few published opinions discussing this statute, the parties had both contributed assets to their family business, Davis Enterprises. At the time of the final separation, Davis Enterprises held the bulk of the parties' assets, including a motel, a laundry, apartments, the marital residence, a farm, and motor vehicles. Davis Enterprises was awarded to the husband, who was ordered to make a payment of $100,000 to the wife over a period of 130 months. On appeal, the wife argued that the trial court had abused its discretion by failing to provide security for the cash award. Although we expressed concern that the wife had been given "an unsecured, personal debt" in exchange for valuable assets, we concluded that there was no abuse of discretion. *Id*.

Subsequently, in *Franklin Bank & Trust Co. v. Reed*, 508 N.E.2d 1256, 1258-59 (Ind. 1987), our supreme court explained that in a dissolution case, when one party receives a money judgment against the other, the general judgment lien statute creates an automatic lien on the indebted party's real estate and chattels. The dissolution statutes give the trial court "authority to overcome the judgment lien, or to augment it, or to limit it." *Id*. at 1259. If the

---

[11] *Davis* addressed a predecessor statute, Indiana Code Section 31-1-11.5-15, which contained substantially similar language.

29

trial court does not exercise its authority under Indiana Code Section 31-15-7-8, the general lien still exists. *See id.*[12]

This case is similar to *Davis* in that the trial court awarded a family business to one party and ordered that party to make a sizable payment to the other over the course of several years. We found no abuse of discretion in *Davis* even though the wife was left with an unsecured personal debt. Neil is in a better position than the appellant in *Davis*, because he has an automatic lien against Lisa's property.

Neil argues that additional security is needed "because there is a history of considerable lack of performance during discovery and no reason to believe compliance with performance on the money order will be any different." Appellee's Br. at 45. Neil argues that Rex was likewise uncooperative and that Lisa's ability to pay the judgment largely depends on Rex's willingness to continue making distributions to Lisa.

The trial court was intimately aware of the contentious nature of discovery in this case. In addition to hearing the parties' arguments as the issues arose, the court heard testimony about discovery issues during the final hearing, and the court also had before it an exhibit that Neil prepared which outlined numerous instances where Neil felt that Lisa and/or Rex had not been cooperative or forthcoming in discovery. Lisa disputed or provided explanations for many of the discovery issues highlighted by Neil. The court apparently did not take the same dire view of Lisa's performance as Neil did. Furthermore, the court heard

---

[12] *Franklin Bank* also refers to Indiana Code Section 31-1-11.5-15, the predecessor of Indiana Code Section 31-15-7-8. Also, at the time that *Franklin Bank* was decided, the general lien statute was codified at Indiana Code Section 34-1-45-2; substantially similar language now appears in Indiana Code Section 34-55-9-2.

evidence that Rex made regular distributions in an amount sufficient to pay both his and Lisa's liabilities and that he pays Lisa in proportion to the amount that he distributes to himself. There is no evidence in the record suggesting that Rex has attempted to freeze Lisa out or that he will attempt to do so in the future. In light of the evidence favorable to the trial court's judgment, Neil has not persuaded us that the trial court abused its discretion by declining to require Lisa to provide security beyond the general judgment lien.

**Conclusion**

This case is remanded to the trial court with the following instructions:

(1) The court shall include Lisa's debt to her father in the chart setting forth the marital assets. The court shall then either recalculate the 33/67% split or adjust the percentages if the court determines that a different division is just and reasonable.

(2) The trial court shall recalculate Lisa's income for child support purposes. If a deduction is made for her taxes, the deduction should not exceed 100% of her taxes. The court shall enter written findings to support any deviations from the Child Support Guidelines.

(3) The trial court shall complete a new CSOW using Lisa's recalculated income and applying the parenting time credit to Neil.

(4) The trial court shall make the corrections or clarifications mentioned in section V(A) of this opinion, as well as in footnotes 5 and 6.

The judgment of the trial court is affirmed in all other respects.

Affirmed in part, reversed in part, and remanded.

RILEY, J., and BAILEY, J., concur.