## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jul 08 2015, 10:44 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | APPELLEE PRO SE |
|---|---|
| Tara Coats Hunt | Courtney Johnson |
| Hunt Rippey Law, LLC | Campbellsburg, Indiana |
| Salem, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jamie Johnson, | July 8, 2015 |
| *Appellant-Respondent,* | Court of Appeals Case No. 88A01-1409-DR-406 |
| v. | Appeal from the Washington Superior Court |
| | Cause no. 88D01-1402-DR-18 |
| Courtney Johnson, | |
| *Appellee-Petitioner.* | The Honorable Frank Newkirk, Jr., Judge |

**Barnes, Judge.**

## Case Summary

[1] Jamie Johnson appeals the trial court's final dissolution decree in his divorce from his wife, Courtney Johnson. We affirm.

# Issues

The restated issues before us are:

    I.      whether the trial court properly divided the marital property of the parties; and

    II.     whether the trial court properly rescinded a previous order for Courtney to pay Jamie's attorney fees.

# Facts

The evidence most favorable to the trial court's judgment is that, beginning in summer 2011, the couple began living together in Jamie's home in Campbellsburg. Jamie had owned the home since 1996. Courtney's four children from another relationship, one of whom is disabled, also lived with them. Jamie has a son from another relationship as well, but he lived primarily with his mother in Louisville.

At the time, the Campbellsburg home was in foreclosure proceedings. Jamie intended to allow the home to be sold in foreclosure and to move into a trailer on land owned by his parents. However, in October 2011, Jamie was able to refinance the mortgage on the residence in large part because Courtney pledged a home she owned in Mitchell as collateral; Jamie's father also co-signed the new mortgage. The parties married in February 2012. After the parties were married, they rented out the Mitchell home for a time and received income from it. Later, Courtney arranged to sell the Mitchell home after Jamie had told her that, if they broke up, she and her children could stay in the Campbellsburg house. From the sale proceeds of the Mitchell home, $16,000

was applied towards the outstanding mortgage debt on the Campbellsburg home in conjunction with the Mitchell home being removed as collateral on the Campbellsburg home's mortgage. Some of the other proceeds from the sale of the Mitchell home were used to purchase a Ford Expedition.

[5] During the marriage, Jamie developed serious health problems related to an aortic aneurysm and incurred substantial medical expenses. After Jamie's medical issues arose, he had difficulty working and later applied for disability benefits. Courtney worked both part-time and full-time during the marriage.

[6] The parties also possessed a number of goats, which Jamie's son and Courtney's children would sometimes show in 4-H fairs. A feed store from which the parties bought goat feed would sometimes give, free of charge, display signs for the goats to be used in fairs.

[7] In early January 2014, Courtney moved out, and Jamie had the locks changed on the Campbellsburg residence. In February 2014, Courtney was able to move her things out of the residence, and she filed for dissolution. In March 2014, the trial court held a hearing after which it ordered that neither party was to dispose of any marital property. Despite this order, Courtney subsequently traded in the Ford Expedition, which was worth about $8,000.00, for two vehicles that had a total value of about $4,000.00. Thereafter, the trial court found Courtney in contempt and ordered her to pay $375.00 in attorney fees to Jamie.

[8] The trial court conducted a final hearing on July 17, 2014. During the hearing, Jamie stated that his medical bills totaled over $350,000.00.[1] Regarding that debt, Jamie's attorney asked him, "I think both parties um, are in agreement with regard to debt. To allow the court to just separate the debt as to the parties be responsible for the debt in their sole name. So any medical debt is yours. . . . you'd assume responsibility for?" Tr. p. 323. Jamie responded, "Correct." *Id.* Jamie also expressly testified that he intended to file for bankruptcy with respect to the medical debt. It also was revealed that Jamie had given one of the goat display signs back to the feed store without Courtney's permission, after Courtney had indicated she wanted the sign for one of her children to use. An iPhone that had been part of the parties' cell phone plan also was discussed, with Jamie saying he had no idea where the phone was and did not care about retrieving it. The parties stipulated that the current value of the Campbellsburg home was $50,000, but that the current mortgage balance on the home was $62,065.51.

[9] After the final hearing but before the trial court entered its final dissolution order, Courtney filed a "Motion for Hearing to Show Evidence of Perjury." App. p. 28. In the motion, Courtney asserted that Jamie had lied on the stand about possession of the iPhone and that he had in fact retrieved it before the time of the final hearing from Courtney's ex-husband, after intervention of the

---

[1] Actually, the bills had accrued to approximately $500,000 as of the final hearing, but had been approximately $350,000 at the time of filing. In her testimony, Courtney stated that she was willing to accept one-half of the responsibility for the medical debt if Jamie did not file for bankruptcy.

Bedford Police Department. At a hearing on Courtney's motion, the evidence was not clear as to whether Jamie retrieved the cell phone on the day of the final hearing or the day after. However, the trial court noted that Jamie had apparently lied about not caring about possession of the iPhone because he had been in contact with Courtney's ex-husband about retrieving it.

[10] After this hearing, the trial court entered its final dissolution order with accompanying factual findings and conclusions on August 29, 2014. The trial court assigned values to a number of items of marital property, including various vehicles, the goat herd, several horses, a pension owned by Jamie, and the marital residence. The trial court also noted Jamie's extensive medical debt and that Jamie intended to discharge it through bankruptcy, but the trial court did not indicate that the debt would be divided between Jamie and Courtney. The trial court proceeded to divide the remaining property between the parties. With respect to the Campbellsburg residence, the trial court awarded it to Courtney because of her present superior ability to pay the mortgage; the trial court provided Courtney until September 1, 2015, to refinance the mortgage in her name only. The trial court also vacated its earlier order requiring Courtney to pay $375.00 in Jamie's attorney fees because of his giving away of one of the goat signs. Jamie now appeals.

# Analysis

## *I. Division of Marital Property*

We first address the trial court's division of the marital property. When reviewing a property division, we begin with a strong presumption that the trial court considered and complied with the applicable law governing property division. *Perkins v. Harding*, 836 N.E.2d 295, 299 (Ind. Ct. App. 2005). In determining the propriety of a martial property division, "our focus is on what the court did, not what the court could have done." *Id.* We will reverse a trial court's property distribution only if there is no rational basis for the award. *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind. Ct. App. 2004). We cannot substitute our judgment for the trial court's, even if the evidence could have supported a different property distribution. *Id.*

The first issue we address is whether the trial court erred in effectively excluding Jamie's substantial medical debt from the marital estate. Under Indiana Code Section 31-15-7-4, a trial court must include all marital property in the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse after marriage and before final separation, or acquired by their joint efforts. *Birkhimer v. Birkhimer*, 981 N.E.2d 111, 120 (Ind. Ct. App. 2012). "Marital property includes both assets and liabilities." *Id.* Trial courts generally have no authority to exclude or set aside any assets or liabilities of the parties, and it must divide all property and debts. *Id.* There is a statutory presumption that an equal division of the parties' marital property is just and

reasonable. *Wanner v. Hutchcroft*, 888 N.E.2d 260, 263 (Ind. Ct. App. 2008) (citing Ind. Code § 31-15-7-5).`

[13] Under ordinary circumstances, the trial court here would have been required to account for Jamie's medical debt of $350,000 at the time of separation when dividing the marital estate.[2] However, "[t]he doctrine of invited error is grounded in estoppel and precludes a party from taking advantage of an error that he or she commits, invites, or which is the natural consequence of his or her own neglect or misconduct." *Balicki v. Balicki*, 837 N.E.2d 532, 541 (Ind. Ct. App. 2005), *trans. denied*. Here, Jamie testified unequivocally that he was agreeable to each party being solely responsible for debts in their individual names, including the medical debt in his name. He also testified as to his intention to seek discharge of those debts through bankruptcy. Under the circumstances, Jamie cannot now fault the trial court for failing to include the medical debt in its calculation of the marital estate and in not dividing that debt between the parties. *See id.* (holding husband invited alleged error in including asset in marital estate by expressly indicating to trial court that it was a marital asset).

[14] Jamie next contends the trial court did not expressly indicate whether it was dividing the remaining assets and liabilities, aside from the medical debt, equally or unequally. That is true, strictly speaking. A trial court, however, is

---

[2] Indeed, Courtney offered to split this debt 50/50 in her testimony before the trial court.

not required to enter specific findings if it equally divides the property, or even if there is an insubstantial deviation from precise mathematical equality. *See Kirkman v. Kirkman*, 555 N.E.2d 1293, 1294 (Ind. 1990); *Hyde v. Hyde*, 751 N.E.2d 761, 766 (Ind. Ct. App. 2001). A trial court only is required to enter findings explaining why it divided the property as it did when it effects a more-than-insubstantial unequal division. *See In re Marriage of Coyle*, 671 N.E.2d 938, 945 (Ind. Ct. App. 1996). Also, it is incumbent upon the parties and their attorneys to present evidence of the value of assets to the trial court; the court is not required to complete the task of valuing assets without such evidence. *Id.*

[15] Here, the trial court assigned values to a number of different assets—i.e., those assets for which the parties provided evidence of their values. We summarize those assets, their values, and to whom the trial court awarded them as follows:

To Jamie:

> Ford F250:  $1,000.00
> Ford F150:  $3,000.00
> Trailer:  $500.00
> Washer/Dryer:  $2,000.00
> Pension:  $3,000.00

To Courtney:

> Boat:  $500.00
> Camper:  $500.00-$1,000.00
> Campbellsburg Residence:  $50,000.00 value, less mortgage debt of 62,065.51, for a net negative value of -$12,065.61.

[16]    In addition to these items, the trial court evenly divided horses and ponies owned by the parties with a total value of $750.00, leaving each party with animals worth $375.00 in value. The parties also owned a herd of twelve goats, with an assessed value of between $1,386.00 and $2,400.00, with Jamie receiving ten of the goats and Courtney two. At the higher value, this means Jamie received goats worth $2000.00 and Courtney $400.00. There also is the matter of the Ford Expedition that Courtney improperly disposed of during the dissolution proceedings, which was worth $8,000.00. By our calculations, if we include the Expedition as being given to Courtney and utilizing the $1,000.00 value for the camper and $2,400.00 value for the goats, Jamie received net assets totaling $11,875.00, while Courtney received net assets totaling -$2,565.61.

[17]    To the extent Jamie claims Courtney was awarded "nearly all of the marital assets," that claim is misleading. Appellant's Br. p. 18. Courtney was awarded assets worth more than the assets awarded Jamie, but she also was required to assume the mortgage debt, which exceeds the total value of assets she was awarded. Accounting for the mortgage debt, and excluding debt the parties agreed to be solely responsible for, Jamie received $14,440.61 more in net assets than Courtney. Put another way, the total value of the marital estate the trial court was asked to divide, excluding the parties' separate debt, was $9,309.49; Jamie was awarded $11,875.00 of that estate and Courtney - $2,565.61.

[18]    Thus, to the extent the trial court deviated from a 50/50 division of the marital estate that it was asked to divide, that deviation was heavily in Jamie's favor.

Technically, the trial court may have been required to enter findings explaining the deviation. However, in order to obtain reversal based on trial court error, the party seeking reversal must demonstrate that he or she was substantially prejudiced by the error. *In re Marriage of Sloss*, 526 N.E.2d 1036, 1041 (Ind. Ct. App. 1998) (citing Ind. Trial Rule 61). Jamie has not established that he was prejudiced by the trial court's failure to explain a deviation from an equal division of the marital estate when any such deviation was in his favor.

[19] Jamie also contends the trial court erred in awarding Courtney the Campbellsburg residence. Jamie's argument on this point, however, focuses on the award of one item of property in isolation, not the trial court's division as a whole. A trial court's disposition of property is to be considered as a whole, not item by item. *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002). A trial court is required to balance a number of different factors in crafting a just and reasonable property distribution. *Id.* at 60. It may allocate some items of property or debt to one spouse depending upon its disposition of other items. *Id.* "Similarly, the factors identified by the statute as permitting an unequal distribution in favor of one party or the other may cut in different directions." *Id.* We as an appellate court should not view any of these factors or assets in isolation and apart from the total mix, as it may upset the balance ultimately struck by the trial court. *Id.* Thus, here, it would be inappropriate for us to review award of the marital residence in isolation.

[20] Regardless, the trial court had ample justification for ruling as it did. In disposing of marital property, trial courts should consider factors such as:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

    (A) before the marriage; or

    (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

    (A) a final division of property; and

    (B) a final determination of the property rights of the parties.

Ind. Code § 31-15-7-5.

[21] Jamie contends he should have been awarded the Campbellsburg residence because he had owned it since 1996, and in light of the relatively brief marriage to Courtney and his serious health issues. However, during the couple's relationship Jamie was prepared to allow the residence to be sold in foreclosure before Courtney stepped in and offered her own residence in Mitchell as collateral to secure a new mortgage on the property. Jamie was prepared instead to live in a trailer on property owned by his parents. After the parties had received periodic rental income from the Mitchell residence, Courtney sold the property upon receiving assurances from Jamie that she and her four children would not have to move out of the Campbellsburg home if their relationship ended. Some of the proceeds from the sale of the Mitchell

property—$16,000.00—was used to pay down the mortgage debt. And, although Jamie mentions having a son who has always known the residence as his home, that child was sixteen at the time of the dissolution and lived primarily with his mother in Louisville. Courtney's four children lived primarily with her, and one of them had special needs. Finally, the trial court noted that going forward, Courtney would be better able to continue paying the mortgage on the property because of her history of employment. Jamie claims his parents would have continued to help him pay the mortgage. Even so, Courtney can pay it directly, and Jamie's parents can assist him in other ways to ensure he has a place to live, as indicated by his previous plan to live in a trailer on their property. In sum, the trial court balanced a number of equities in this case and decided it was more appropriate for Courtney to take possession of the Campbellsburg residence, as well as the accompanying mortgage obligation. It was not an abuse of discretion to reach that conclusion.

[22] Jamie also claims it was an abuse of discretion for the trial court to allow Courtney a full year to refinance the mortgage into her name. However, there are no set rules regarding time frames for refinancing a debt in situations such as this. Reported decisions have referred to periods as long as three years to refinance mortgage indebtedness following dissolution and an award of real estate to one of the spouses. *See Philips v. Delks*, 880 N.E.2d 713, 715 (Ind. Ct. App. 2008). Indeed, our supreme court has contemplated that a transfer of an asset to one party does not necessarily require refinancing of a joint debt on the asset solely to the party receiving the asset. *See Bailey v. Mann*, 895 N.E.2d

1215, 1218 (Ind. 2008) (holding trial court did not have to require wife to refinance or remove husband's name from vehicle lease for vehicle she received in dissolution, so long as wife continued making payments on the lease). Rather, in the event a party awarded an asset fails to make payments toward a joint debt on the asset, a trial court may find that party in contempt and award monetary damages to the other party for injury to his or her credit, as well as for any inconvenience and frustration suffered. *Id.* That is precisely the case here. Should Courtney fail to make payments on the mortgage prior to it being refinanced, she may be held in contempt and appropriate damages awarded to Jamie (as well as his father, who also is named on the mortgage). It was not an abuse of discretion to allow Courtney one year to refinance the mortgage.

[23] As a final issue related to property division, Jamie challenges the trial court's order requiring him to be solely responsible for the cell phone cancellation fee for the iPhone that apparently was being used by Courtney's daughter. According to the parties' testimony, this fee was $350. Courtney asserts that it is appropriate to hold Jamie solely responsible for this fee, because he suspended cell phone service on the iPhone when Courtney moved out, forcing her to obtain new cell phone service. We should not view particular property division matters in isolation as opposed to viewing the division as a whole. On that point, Jamie was awarded substantially more in net assets than Courtney. We see no compelling reason to require Courtney to share in the cost of the iPhone cancellation fee.

## II. Attorney Fees

[24] As a separate issue not strictly related to property division, we address the trial court's decision in the final dissolution decree to reverse its earlier order requiring Courtney to pay $375.00 in attorney fees to Jamie after she disposed of the Expedition during the dissolution proceedings. The trial court reversed this order on the basis of Jamie's having disposed of a goat display sign that was supposed to be given to one of Courtney's children. Pursuant to Indiana Code Section 31-15-10-1, a trial court may order a party in a dissolution proceeding to pay a reasonable amount of the other party's attorney fees, after considering the parties' resources, their economic condition, the parties' abilities to engage in gainful employment and earn income, and other factors bearing on the reasonableness of the award. *Troyer v. Troyer*, 987 N.E.2d 1130, 1142-43 (Ind. Ct. App. 2013). One such "other factor" includes improper actions of one party necessitating the incurrence of attorney fees by the other party. *Id.* at 1143. We review a trial court's ruling on attorney fees in a dissolution for an abuse of discretion. *Id.* at 1142.

[25] Here, the trial court essentially found that both parties engaged in misconduct during the dissolution proceedings by disposing of marital property: Courtney by trading in the Expedition, and Jamie by giving the goat sign back to the feed store after it had been made clear that one of Courtney's children was going to use the sign. Jamie primarily relies upon the vast monetary difference between the Expedition and the goat sign, which had been obtained for free from the feed store. However, despite the monetary difference, the goat sign had special

meaning to Courtney's child for use during a 4-H fair. Jamie also contends that he merely had loaned the sign back to the feed store, but the fact is that it was not in his possession at the time of the final hearing and could not be provided to Courtney's child as had been intended. In sum, despite the disparate monetary impacts upon the marital estate related to Courtney's and Jamie's improper disposal of marital property, we cannot say the trial court abused its discretion in ultimately not requiring Courtney to pay any attorney fees to Jamie.

## Conclusion

The trial court properly did not include Jamie's medical debt in the estate per Jamie's express representation that he would be solely responsible for it. Any error in failing to explain a deviation from a 50/50 division of remaining property was harmless as to Jamie, there was sound justification for awarding the Campbellsburg residence to Courtney, and there is no clear basis for splitting the iPhone cancellation fee between the parties. Also, the trial court did not abuse its discretion in refusing to order Courtney to pay attorney fees to Jamie. We affirm.

Affirmed.

Riley, J., and Bailey, J., concur.