## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 28 2017, 8:23 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

F. Anthony Paganelli
Thomas D. Perkins
Raegan M. Gibson
Paganelli Law Group
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Julia Blackwell Gelinas
Mark J. Roberts
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Alisa K. Wright,

*Appellant-Respondent,*

v.

A. Lance Wright,

*Appellee-Petitioner.*

September 28, 2017

Court of Appeals Case No.
06A01-1701-DR-52

Appeal from the Boone Superior Court

The Honorable Matthew C. Kincaid, Judge

Trial Court Cause No.
06D01-1208-DR-499

**Najam, Judge.**

# Statement of the Case

Alisa K. Wright ("Wife") appeals the trial court's final dissolution decree, which ended her marriage to A. Lance Wright ("Husband"). Wife presents three issues for our review:

1. Whether the trial court abused its discretion when it divided the marital property.

2. Whether the trial court erred when it awarded Husband a security interest in Wife's equity in a limited liability company.

3. Whether the trial court abused its discretion when it ordered Wife to pay $120,000 of Husband's attorney's fees.

Finding no error, we affirm.

# Facts and Procedural History

Husband and Wife married in 1987. There were no children born of the marriage. In August 2012, Husband filed a petition for dissolution of the marriage. Following a final hearing on the petition in September 2016, the trial court issued a dissolution decree dividing the marital property equally between the parties. In January 2017, the court entered amended findings and conclusions, which thoroughly address the evidence and arguments of the parties and explain the court's reasoning:

1. [Husband and Wife] were married on June 13, 1987. The parties were separated as a matter of law on August 16, 2012, the date [Husband] filed his Verified Petition for Dissolution of Marriage in this action and the parties had been Indiana residents. . . . There are no children born of this marriage. [Wife] is not pregnant. . . .

BACKGROUND

2. When they married, [Husband] and [Wife] were both approximately 23 years of age and fresh out of Purdue. [Wife] studied pharmacy. [Husband] studied engineering. Neither party brought significant assets into the marriage.

3. [Husband], who was graduated a year before [Wife], worked one year at Roadway Trucking in Chicago before returning to Indiana to marry [Wife]. [Husband] next worked at Excel Manufacturing for approximately two years as a quality engineer. [Husband] then spent seven years at Cummins in quality engineering and manufacturing engineering. After that, [Husband] went to Sterling Industries where he worked in engineering for two years. Next, [Husband] went to Cook Imaging which was later acquired[] by Baxter. [Husband] spent nine years at Cook Imaging/Baxter as an engineering manager.

4. [Wife], married two weeks after her graduation, began her career at Eli Lilly where she was employed for nine years from 1987 through 1996. In 1996, [Wife] joined a start-up business, National Notification Center (NNC), where she worked for three years.[] [Wife] next became employed at Cook Imaging/Baxter[] where she worked for six years until she left in 2004.

BioC

5. The next professional endeavor, for [Wife] as a founder/CEO and [Husband] as an investor/employee, was BioC. Prior to BioC, the Wrights' wealth of about $4 million was comprised of

about $1.55 million [Wife] had received above what the parties otherwise would have otherwise had[] and deducting out equivalent receipts by [Husband], other assets that they acquired and saved[] from each having gainful employment in the first seventeen years of marriage, and gifts Mr. and Mrs. Kilgas[] made to the couple. Because of what she had been able to accomplish in her career, [Wife] was about 70% responsible for the wealth of the marriage and [Husband] about 30% before BioC.[]

6. [Wife] started BioC in 2005. . . . BioC's business is the storage and furnishing of the materials to drug companies.

7. [Husband] left his employment with Baxter to join BioC when it opened in 2006 as Chief Engineering Officer then as Chief Operating Officer where he remained until he was terminated in August of 2012. [Wife] has always been Chief Executive Officer.

8. Between 2005 and November of 2008, [Husband] and [Wife] paid into BioC a total of approximately $3,260,000.00 of combined capital contribution in exchange for units in November 2005 and November 2008. Units were allocated as to give [Wife] approximately 75% and [Husband] approximately 5% of the total units of BioC.

9. BioC needed a building. [Wife] and her parents, Mr. and Mrs. Kilgas formed a real estate holding company GOT to purchase thirty-two acres in Bloomington, Indiana and build suitable facilities to lease to BioC. The building was expanded in 2007 to accommodate a large client. GOT currently owns the real estate and building where BioC is located. BioC pays GOT rent. Shelly Kilgas, [Wife]'s sister, manages GOT.

10. In 2005, [Wife] purchased 11.25 units of GOT for $22,500.00. Each unit cost $2,000.00. Mr. and Mrs. Kilgas contributed $2,370,000.00 for their 99% ownership interest. [Wife] now individually owns 23.93 units[,] the additional 12.68

units having been given directly to her by Mr. and Mrs. Kilgas (6.34 units each). [Husband] owns no units of GOT, never having purchased any or had any gifted to him. The Court FINDS that [Wife]'s total ownership of GOT is worth $47,860.00—$2,000.00 per unit.

11. For several quarters, BioC went through its startup phase. It lost cash. It sought new customers. It landed a large customer whose contract gave the company a boost. Buoyed up by the regularity of income from the one large contract, BioC, principally by and through [Wife], looked for new customers and was finding them. The company was diversifying its business and offsetting the risk from having a single large client. Just before the company was about to become really profitable, CEO [Wife] and COO [Husband] began to have marital trouble.

12. Two truths, one more significant than the other, emerge from the testimony and evidence presented. First, work at BioC got uncomfortable for [Wife] and [Husband] and for many of BioC's employees. Second, and more importantly, despite the drama, BioC was able to continue its maturation from start-up to established and profitable company. None of the unpleasantness hurt BioC's business.

13. [Wife] advances two theories about [Husband] and his work at BioC. One, he was incompetent.[] Two, he was deceitful.[] For either or both of these reasons, generally a theory of dissipation, [Husband] ought to receive a share of the marital estate of less than fifty percent, so she theorizes. While he does not call for an unequal distribution, [Husband], for his part, suggests that [Wife] was managing the company poorly and that he and his acolytes working there saved it.

14. But, at least insofar as harming BioC and diminishing the marital estate, the Court finds that any mistakes [Husband] made during his six plus years working at BioC did not do that. Any of

[Husband]'s dishonesty or surreptitious office politicking, while personally hurtful to [Wife], did not financially harm her or BioC.

15. [Wife] and a human resources employee met with [Husband] on August 9, 2012 to inform him that his last day at BioC was to be August 31, 2012. In that meeting, [Husband] was told not to return to BioC until the following Monday. [Husband] disobeyed that instruction and, along with two other employees, visited BioC on Saturday August 11, 2012. Further, [Husband] returned alone to BioC on Sunday, August 12, 2012. [Husband] admits he retrieved some emails and financial records of BioC but says that he was entitled to do that and that many items retrieved were personal in nature. It is suspicious that he would come into the office on the weekend when specifically told not to and then collect material. But again the Court has not been shown how this disobedience harmed the value of BioC. As for his right as a minority owner to review financial records, [Husband] certainly had the right to look at financial records of a business in which he was a minority owner. But taking them out was not the proper way to go about exercising that right.

BIOC VALUATION

16. On August 16, 2012, two weeks before his scheduled last day at BioC, [Husband] filed his Petition for Dissolution of Marriage. He did that before his ownership units were converted to assignee status under the BioC Operating agreement.[]

17. BioC is more valuable today than at the date of separation.[]

18. When [Husband] left, the value of the business, as will be discussed in more detail below, was about $1.5 million. BioC is [Wife]'s creation. Of the $3.2 million that [Wife] and [Husband] invested during its start-up phase, most of which was money [Wife] brought into the marriage, more than half of that was gone in 2012. In evaluating whether something other than a

50/50 division of wealth is appropriate, as of 2012 the parties' relative contribution to the marital estate is an equitable wash. Put another way, from 1987-2005, [Wife] has made most of the money the Wrights earned. From 2005-2012, she lost most of what they lost.

19. At the time of the filing of [Husband]'s Verified Petition for Dissolution of Marriage, [Husband] owned 4,223.81 units of BioC as an Assignee and [Wife] owned 58,381.624 units as a member.

20. Jason Thompson of Sponsel CPA Group provided his opinion as to the value of BioC as of September 30, 2012 of the 80.3% controlling ownership interest of BioC as $1,684,000. He is qualified by his experience and education[] to render an opinion assistive to the Court on business valuation. Mr. Thompson's analysis of BioC's value was based on the capitalization of earnings method within the income approach and considered publicly-traded and private companies.

21. Mr. Thompson included the enterprise value and fair market values of public companies in his analysis. This is the one area of his testimony and report that the Court finds unhelpful.[] Overall, his report is thorough and authoritative, but publicly traded companies are too dissimilar to BioC to have any relevance in its valuation. The Court doesn't think that the decision to factor publicly traded companies into the comparison withstands cross examination. The Court finds that a proper valuation necessitates reweighing earnings capitalization and comparable private companies.

22. Mr. Thompson did not consider either [Husband]'s ownership of a "minority interest" or the provisions of Operating Agreement regarding his current ownership as an "Assignee." For this marital dissolution case, this is the correct approach. Mr. Thompson valued the asset under the one pot theory applied in Indiana. The more than eighty percent of BioC that [Wife]

and [Husband] together own and control is a majority interest, particularly considering that [Husband] filed for dissolution before he separated from the company.

23. The capitalization of earnings method includes discretionary use of a capitalization rate and long-term discount rate. One dollar of expected earnings from a real estate company may be valued differently than the same dollar of expected earnings from a tech company. Discount rates are a function of risk. Capitalization rates are function of expected growth. But Mr. Thompson is qualified to perform a business valuation and to select an appropriate capitalization rate and long[-]term discount rate.

24. [Wife]'s interest of 58,381.624 units [or] 74.88% of BioC is worth $1,403,706.00. [Husband]'s 4,223.81 units [or] 5.42% is worth $101,604.00. The total value to the marital estate of the Wrights' interest in BioC of 62,605.433 units [or] 80.3% of the controlling units of BioC is $1,505,310.00. Each unit [Husband] and [Wife] own is worth $24.05[]. . . .

\* \* \*

POST-DISSOLUTION FORESEEABLE ECONOMIC CIRCUMSTANCES

59. [Husband] and [Wife] are both well educated[] and have been professionally employed their entire adult lives. Each party has worked in jobs and had experiences that fit his and her personality and professional traits. Each is fully employable. Each can financially support himself and herself. Neither has requested spousal maintenance. Neither is entitled to the same. Neither party needs a greater share of the marital estate to meet basic necessities of life.

\* \* \*

BALANCE SHEET

64. In summary, the presumption of an equal division has not been rebutted.

65. The Parties' assets and liabilities are identified and divided with the values below:

[Total marital assets of $3,403,482.25; $1,549,010.36 to Husband; $1,854,471.89 to Wife; $200,546.38 in debt on Tucson real estate to Husband; equalization payment from Wife to Husband of $253,003.96, for a fifty-fifty division.]

ATTORNEY'S FEES

66. Indiana Code section 31-15-10-1 permits a trial court to order a party in a dissolution proceeding to pay a reasonable amount of the attorney[']s fees of the other party. *Troyer v. Troyer*, 987 N.E.2d 1130, 1142 (Ind. Ct. App. 2013). In exercising its discretion to award attorney fees, the Court should consider "the spouses' resources, economic condition, ability to earn income, and other similar factors that would bear on the reasonableness of the award." *Mitchell v. Mitchell*, 875 N.E.2d 320, 325 (Ind. Ct. App. 2007). This may also include a consideration of the responsibility of a party in incurring the fees. *Id.* [Husband] has requested that the Court order [Wife] to pay $150,000.00 towards [Husband]'s attorney[']s[] fees. [Wife] has requested that [Husband] pay $975,000.00 towards [Wife]'s attorneys' fees.

67. As the Court has previously noted in hearings, this dissolution proceeding is complex with many challenging issues.

68. [Husband] has been represented by Mark Roberts of Frost Brown Todd throughout this proceeding. As of August 31, 2016, [Husband] incurred $340,000.00 in attorney fees in this dissolution of marriage proceeding. This amount does not include fees incurred from September 1, 2016 through the conclusion of the six-day trial on September 23. This amount

also does not include attorney fees incurred by [Husband] in the other related litigation matters relating to subpoenas and non-party requests to [Husband] to produce documents and [Husband]'s giving of depositions pursuant to subpoenas.

69. [Husband] has paid Frost Brown Todd $180,000.00 to date. The $180,000.00 came from the $300,000.00 that [Husband] received from the agreed equal division of the bank accounts just prior to the filing of the divorce petition. [Husband] has spent all his cash account as he utilized the remaining portion of the $300,000.00 to pay living expenses from the date of his termination of employment at BioC until the date he became employed at Barry Wehmiller in April 2013.

70. [Wife] incurred attorney fees in this dissolution proceeding totaling $1,100,000.00. [Wife] was originally represented by Andrew Mallor of Bloomington, Indiana. Thereafter, [Wife] has been represented by Andrew Soshnick of Faegre Baker Daniels and more recently by Janice Mattingly of Hollingsworth and Zivitz, as well. All of [Wife]'s attorney fees of $1,100,000.00 have been previously paid, except for a small amount.

71. Although [Husband] secured employment with Barry Wehmiller in 2013 and is earning in the range of approximately $120,000.00 per year, [Husband]'s future income earning ability and income earning history over the past four years since the divorce was filed is inferior to [Wife].

72. BioC has come out of the "start-up" phase of its existence and [Wife] is now earning substantial income from BioC. [Wife]'s 2015 K-1 from BioC shows that [Wife] had self-employment earnings approaching [one] million dollars in 2015.

73. [Wife]'s tax returns for 2012, 2013 and 2014 by their Schedule E show that [Wife] earned income in the mid to upper six figures from BioC for these years.

74. [Husband]'s request for an attorney's fee award is reasonable in light of the size of the marital estate and when considering the complexity of the issues involved in this proceeding.

75. [Husband]'s overall attorney fees incurred in this proceeding are reasonable considering [Wife] incurred attorney fees in this dissolution that are approximately three times greater than the fees incurred by [Husband].

76. It is also important in the Court's consideration of attorney fees that [Wife]'s tax returns of 2012, 2013[,] and 2014 show that [Wife] benefitted from net operating loss carry forward and was able to offset tax liability in years 2012, 2013[,] and 2014 with prior year losses. The ownership structure of BioC did not afford [Husband] the same ability to offset tax liability during the pendency of the matter and while he was able to employ qualified Counsel, his resources were not equivalent to [Wife] and what she was able to do. [Husband] owes his attorneys a much greater percentage of their overall fees than does [Wife]. During the pendency of the matter, [Wife] has had greater ability to employ counsel. A shifting in fees is necessary so that there be equivalency in the ability to employ Counsel.

77. The Court does not think that either side bears a greater responsibility for fees in this case. Entanglements of both parties generally contributed to the expense of this case.

78. The Court awards [Husband] $120,000.00 of attorney's fees, which shall be paid by [Wife] directly to Frost Brown Todd LLC in full within twelve (12) months of the date of this Divorce Decree. The amount of not less than $10,000.00 shall be paid on the fifteenth day of each month for twelve (12) months starting February 15, 2017. If [Wife] defaults in timely making any of the twelve payments of attorney's fees awarded and fails to cure within seven days of notice of a default, the entire sum will become due and owing. If the payments are timely made, no interest shall be due. If there is an uncured default, interest will

be due at the statutory rate on the entire unpaid balance from date of Decree until fully paid.

79. For all of the same reasons set forth above, the Court finds that [Husband] shall not be ordered to contribute any amount towards [Wife]'s attorneys' fees.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED AS FOLLOWS:

1. The parties' marriage is hereby DISSOLVED;

2. The parties' marital estate is DIVIDED as the Balance Sheet hereinabove provided with [Husband]'s Counsel preparing qualified domestic relations orders in instances where pension and 401k accounts in [Wife]'s name have been set off to [Husband];

3. [Wife] SHALL quitclaim her interest in 8302 Anne Avenue, Bloomington, Indiana to [Husband], deliver the keys and vacate the premises in a broom clean condition on or before February 28, 2017 giving notice to [Husband] seven days in advance if she moves out earlier;

4. [Husband] SHALL refinance or otherwise remove [Wife] from the mortgage obligation on the Tucson residence on or before August 1, 2017. [Wife] SHALL furnish all records in her possession pertaining to the Tucson residence and all keys within thirty days.

5. [Husband] SHALL disclaim all interest and assign to [Wife] the right to receive any payment for his interest in BioC thirty days after [Wife] pays $120,000.00 of the equalization payment set forth on the balance sheet herein. [Wife] SHALL make the equalization payment of $253,003.96 in payments not less than eleven $20,000.00 installments due on the fifteenth of each month beginning February 15, 2017 with the balance of the

equalization $33,003.96 due on January 15, 2018. There shall be no interest so long as the installments are made on time. If [Wife] defaults in timely making any of the twelve payments of attorney's fees awarded and fails to cure within seven days of notice of a default, the entire sum will become due and owing. If there is an uncured default, interest will be due at the statutory rate on the entire unpaid balance from date of Decree until fully paid.

6. Personal property is DIVIDED as hereinabove provided;

7. [Wife] SHALL pay $120,000.00 of [Husband]'s Attorney's fees as hereinabove provided . . . .

Appellant's App. Vol. 2 at 52-68. Husband filed a motion to correct error alleging in relevant part that the trial court should have awarded him a security interest in Wife's BioC shares pending Wife's satisfaction of the equalization payment. The trial court granted that motion.[1] This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[4]     In *Trabucco v. Trabucco*, 944 N.E.2d 544, 548-49 (Ind. Ct. App. 2011), *trans. denied*, we set out the applicable standard of review where, as here, a party requested that the trial court issue findings and conclusions.

---

[1] Wife filed a motion to stay execution of judgment pending appeal and requested an appeal bond. Wife does not state how the trial court ruled on that motion or on that request, but neither is relevant to this appeal.

When findings and conclusions thereon are entered by the trial court pursuant to the request of any party to the action, we apply a two-tiered standard of review.

First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Id.* (quoting *Balicki v. Balicki*, 837 N.E.2d 532, 535-36 (Ind. Ct. App. 2005), *trans. denied*) (internal citations omitted).

### Issue One: Division of Marital Property

Wife first contends that she rebutted the presumption of an equal division of the marital property and that the trial court abused its discretion when it divided the marital property equally. Indiana Code Section 31-15-7-5 provides as follows:

The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

> (A) before the marriage; or

> (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

> (A) a final division of property; and

> (B) a final determination of the property rights of the parties.

[6]   The division of marital property is highly fact sensitive, *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002), and within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. *Love v. Love*, 10 N.E.3d 1005, 1012 (Ind. Ct. App. 2014). We will reverse a trial court's division of marital property only if there is no rational basis for the award; that is, if the result is clearly against the logic and effect of the facts and circumstances,

including the reasonable inferences to be drawn therefrom. *Luttrell v. Luttrell*, 994 N.E.2d 298, 301 (Ind. Ct. App. 2013), *trans. denied*. We will also reverse if the trial court has misinterpreted the law or disregarded evidence of factors listed in the controlling statute. *Webb v. Schleutker*, 891 N.E.2d 1144, 1153 (Ind. Ct. App. 2008). When we review a claim that the trial court improperly divided marital property, we consider only the evidence most favorable to the trial court's disposition of the property without reweighing evidence or assessing witness credibility. *Id.* Although the facts and reasonable inferences might allow for a conclusion different from that reached by the trial court, we will not substitute our judgment for that of the trial court. *Id.* at 1154.

[7] Wife first contends that she rebutted the presumption of an equal division of the marital property because the evidence shows that: her distribution was "illiquid" and she does not have the "appropriate means" to pay the equalization payment to Husband; her contributions to the acquisition of BioC and other marital property were greater than Husband's; and the parties had equal economic circumstances and earning abilities at the time of the property division. Appellant's Br. at 13. We address each of these contentions in turn.

*Illiquid Distribution*

[8] In essence, Wife maintains that the only appropriate division of the marital property would be a sixty-forty split in her favor because "[i]t is difficult, if not impossible, for her to effectively convert [her interest in BioC] . . . into the cash necessary to make the Equalization Payment" of $253,003.96. *Id.* at 17. In particular, Wife asserts that her interest in BioC, a closely held business, is not

marketable and that her inability to liquidate the business "directly impacts [her] ability [to] fund the dramatic obligations imposed by the Trial Court." *Id.* at 14. The trial court valued Wife's membership interest in BioC at $1,403,706. Wife's argument assumes that liquidation of her interest in the business would be the only means available for her to satisfy the equalization payment to Husband due within a year. But Wife's membership interest in BioC is personal property that can be pledged as collateral to secure a loan if that should be necessary to meet her obligation. *See* I.C. § 23-18-6-2 (the interest of a member in a limited liability company is personal property). And Wife ignores the trial court's award to her of $300,142.53 in cash, which is sufficient to cover the equalization payment.

[9] Equalization payments are sometimes necessary to accomplish a division of property, and to that end a trial court may require "either spouse to pay an amount, either in gross or in installments, that is just and proper." I.C. § 31-15-7-4(b)(2). Such orders are common, even where illiquidity presents a challenge, as it often does. Thus, for example, it may become necessary for the spouse who is ordered to pay an equalization payment to finance and amortize the payment over an extended period. Here, Wife contends that the "limited marketability" of her interest in BioC makes such a payment "difficult, if not impossible," but she has not shown on this record that she has neither the money, the means, nor the credit to pay the $253,003.96 equalization payment as ordered by the court. Her argument, in effect, that illiquidity should preempt all other considerations amounts to a request that we reweigh the evidence,

which we cannot do. Wife has not shown that the dissolution court's equalization order is not just and proper.

## *Wife's Contributions*

Wife points out that the trial court "conceded that her contribution to BioC was greater than" Husband's contribution and found that she was "'about 70% responsible for the wealth of the marriage' before starting BioC." *Id.* at 15-16. Thus, she maintains that the trial court should have awarded "the entire BioC equity to [her], in favor of an unequal division." *Id.* at 15. But the court also found that, while Wife "made most of the money the Wrights earned," she also "lost most of what they lost." Appellant's App. Vol. 2 at 57. And Wife does not challenge the court's finding that, "as of 2012[,] the parties' relative contribution to the marital estate [was] an equitable wash" since "more than half of [what the parties had invested in BioC] was gone in 2012." *Id.* Wife has not persuaded us that the trial court clearly erred in the equal division of the marital property after taking into account her contributions and her losses, as well as the fact that the parties were married for twenty-five years.

## *Economic Circumstances/Earning Abilities*

Wife asserts that the trial court's finding that "neither party [i]s in a more advantageous position in terms of earning capacity . . . fails to account for the singular source of [Wife]'s income: BioC." Appellant's Br. at 16. In other words, Wife maintains that, "in ordering an Equalization Payment that far exceeded [her] salary, [the court] failed to properly consider that [her] income

would be tied directly to a single startup company." *Id.* at 17. But Wife's salary is not the only measure of her financial capacity. And, again, Wife ignores the more than $300,000 in cash she was awarded, which is sufficient to cover the equalization payment. In this section of her argument,[2] Wife does not challenge the trial court's finding that her "self-employment earnings" for 2015 "approach[ed one] million dollars[,]" while Husband earns "approximately $120,000.00 per year." Appellant's App. Vol. 2 at 67. Wife has not persuaded us that the trial court clearly erred in the equal division of the marital property based on the parties' foreseeable economic circumstances and respective earning abilities.

### Wife's Other Contentions

[12] Wife next contends that the trial court clearly erred in equally dividing the marital property because it "failed to consider the binding terms of the [BioC] Operating Agreement." Appellant's Br. at 18. She maintains that the "proper mechanism for [Husband]'s dissociation from BioC was to act in accordance with the Operating Agreement," and she directs us to specific sections of the Operating Agreement, which, she asserts, "allow the BioC Board of Directors to establish the value of the BioC units upon the divorce of a member." *Id.* at 18-19. But Wife does not explain how compliance with the terms of the Operating Agreement would have altered the award of BioC units to Husband,

---

[2] Wife challenges the trial court's findings regarding her income in the context of her argument on the attorney's fee issue, but she does not challenge those findings in relation to her contention that the trial court erred when it assessed the parties' economic circumstances and earning abilities.

and she does not direct us to any part of the record showing that she made any argument on this issue to the trial court. Wife has waived this issue for our review. *See Basic v. Amouri*, 58 N.E.3d 980, 984 (Ind. Ct. App. 2016) (noting we will not become an advocate for a party, or address arguments that are inappropriate or too poorly developed or expressed to be understood). Waiver notwithstanding, the trial court found that Husband filed his dissolution petition "*before* his ownership units were converted to assignee status under the BioC Operating agreement." Appellant's App. Vol. 2 at 38 (emphasis original). And Wife has not shown that that finding is erroneous.

[13] Finally, Wife contends that the trial court clearly erred in equally dividing the marital property in light of Husband's alleged dissipation of marital assets. Dissipation generally involves the use or diminution of the marital property for a purpose unrelated to the marriage and does not include the use of marital property to meet routine financial obligations. *Hardebeck v. Hardebeck*, 917 N.E.2d 694, 700 (Ind. Ct. App. 2009). Dissipation of marital assets may also include the frivolous and unjustified spending of marital assets. *Id.* The test for dissipation is whether the assets were actually wasted or misused. *Id.* To determine whether dissipation has occurred, we consider the following factors: 1. Whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage; 2. The timing of the transaction; 3. Whether the expenditure was excessive or de minimis; and 4. Whether the dissipating party intended to hide, deplete, or divert the marital asset. *Id.*

[14]　Wife asserts that Husband's "obvious and heinous breaches of his fiduciary obligations resulted in dissipation of the marital estate, and specifically [Wife]'s share of it." Appellant's Br. at 20. In support of that contention, Wife first maintains that there was "sufficient evidence" of Husband's dissipation, such as testimony that he "worked with others to increase the expenses and risk to BioC," he "breached certain fiduciary duties," and his "actions introduced uncertainty into BioC's operations." Appellant's Br. at 20. But the trial court expressly found that "any mistakes [Husband] made during his six-plus years working at BioC" did not harm BioC or diminish the value of the marital property. Appellant's App. Vol. 2 at 56. We will not reweigh that evidence on appeal.

[15]　Wife maintains that the trial court erred when it "declined to allow testimony that would quantify [Husband]'s dissipation." Appellant's Br. at 21. In particular, three weeks before trial, after the discovery deadline and after Wife had submitted her final witness list, Wife attempted to add two additional expert witnesses to testify about Husband's dissipation of marital assets, including their interests in BioC. The trial court granted Husband's motion to strike those witnesses as untimely. On appeal, Wife makes no argument in support of her allegation that the trial court erred when it struck the witnesses. The issue is waived. Waiver notwithstanding, in *Wiseheart v. State*, 491 N.E.2d 985, 991 (Ind. 1986), our Supreme Court outlined factors that a trial court should consider when a party seeks to introduce a witness whose identity is disclosed to the opponent after discovery has been closed. Wife does not deny

that she did not identify the witnesses before the close of discovery, and she does not contend and makes no cogent argument to show that the trial court abused its discretion when it struck the witnesses. Wife has not demonstrated error.

[16] In sum, it was Wife's burden to rebut the presumption of an equal division of the marital property. As such, on this issue she appeals from a negative judgment. On appeal, we will reverse a negative judgment only where the trial court's decision is contrary to law. *Kotsopoulos v. Peters Broadcast Eng'g, Inc.*, 962 N.E.2d 97, 105 (Ind. Ct. App. 2011). "In making the determination whether a trial court's decision is contrary to law, we must determine if the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion, and the trial court has reached a different conclusion." *Id.* Wife has failed to demonstrate that an equal division of marital property would not be just and reasonable. *See* I.C. § 31-15-7-5. We hold that the trial court's equal division of the marital property was not clearly erroneous or contrary to law.

### Issue Two: Security Interest

[17] Wife contends that "the Trial Court's grant of a security interest [in BioC to Husband] was unjust and unsupported by the findings." *Id.* at 24. Wife acknowledges that Indiana Code Section 31-15-7-8 authorizes the trial court to "provide for the security, bond, or other guarantee that is satisfactory to the court to secure the division of property." But Wife maintains that the trial court

"failed to recognize" case law expressing "disfavor" for granting security interests. Appellant's Br. at 23.

[18] Wife is correct that, in *Crider v. Crider*, 15 N.E.3d 1042, 1067 (Ind. Ct. App. 2014), *trans. denied*, we stated that "continued entanglement by two spouses in a closely-held business after divorce *generally* should be avoided, unless it is impossible to do so because of the absence of other liquid assets in the marital estate to equitably divide the property." (Emphasis added). But in *Crider* we held that the trial court was "fully empowered" to grant wife a security interest in husband's business holdings, including both his stock and LLC membership interests, provided that wife did not retain "ownership and control" of those holdings. *Id.* at 1067-70. We have also observed that the "'statutory language obviously affords the court the broadest possible discretion in requiring security' and that '*we will not substitute our judgment for that of the trial court*.'" *Birkhimer v. Birkhimer*, 981 N.E.2d 111, 127 (Ind. Ct. App. 2012) (quoting *Davis v. Davis (In re Marriage of Davis)*, 182 Ind. App. 342, 395 N.E.2d 1254, 1259 (1979)) (emphasis added). Wife has not demonstrated that the trial court erred when it awarded Husband a security interest in BioC.

## Issue Three: Attorney's Fees

[19] Wife contends that the trial court erred when it ordered her to pay $120,000 of Husband's attorney's fees. As our Supreme Court has explained,

> [a] trial court is statutorily authorized to "order a party to pay a
> reasonable amount for the cost to the other party of maintaining
> or defending" dissolution proceedings, including "attorney's

fees . . . ." Ind. Code § 31-15-10-1(a) (emphasis added). *But there is no statutory directive as to what factors must be considered in determining such reasonable amount.* While emphasizing that these *attorney's fees orders are subject to the broad discretion of the trial court*, various Indiana appellate cases provide guidance for such determinations. The resources of the parties, their relative economic circumstances, and their ability to engage in gainful employment and earn adequate income must be considered. *See Cowart v. White*, 711 N.E.2d 523, 529 (Ind. 1999); *Weigel[ v. Weigel]*, 24 N.E.3d[ 1007,] 1012[ (Ind. Ct. App. 2015)]; *Troyer v. Troyer*, 987 N.E.2d 1130, 1142-1143 (Ind. Ct. App. 2013), *trans. denied*; *Connolly v. Connolly*, 952 N.E.2d 203, 208 (Ind. Ct. App. 2011), *trans. not sought*. This list is not exclusive, and other factors bearing on reasonableness may also be considered, for example, which party initiated the action, whether fees and expenses were incurred due to a party's misconduct, and the ability of a party to pay. *See Selke v. Selke*, 600 N.E.2d 100, 102 (Ind. 1992); *Carrasco v. Grubb*, 824 N.E.2d 705, 712 (Ind. Ct. App. 2005), *trans. denied*.

*Masters v. Masters*, 43 N.E.3d 570, 576 n.8 (Ind. 2015) (emphases added). A trial court may consider both a party's assets and income when making an attorney's fee award. *See, e.g.*, *Maxwell v. Maxwell*, 850 N.E.2d 969, 975 (Ind. Ct. App. 2006), *trans. denied*.

[20] Wife maintains that the trial court erred when it ordered the attorney's fee award because the court (1)"fundamentally mischaracterized [her] income," (2) "took into account an improper tax deduction," and (3) took "no account of the illiquidity of [her] share of the marital assets." Appellant's Br. at 25-26. We address each contention in turn.

[21] Wife first asserts that the trial court attributed income to her based on her "share of BioC earnings for tax purposes, not actual distributions," which, Wife alleges, was improper. *Id.* at 25. In particular, Wife maintains that the "evidence presented at trial established that [Wife] did not have th[e] level of income [found by the trial court], rather that was income attributed to her—but that she did not receive—due to the BioC structure as an LLC." *Id.* Wife states that her income was not in the "mid to upper six figures from BioC," as found by the trial court, but "both [Wife] and [Husband] had equivalent salaries with their respective employers--$120,000 per year." *Id.*

[22] We hold that the evidence supports the trial court's findings on this issue. During the final hearing, Husband introduced into evidence Wife's tax returns from 2012 to 2015, which support the trial court's findings that Wife: "is now earning substantial income from BioC"; had "self-employment earnings approaching [one] millions dollars in 2015";[3] and, according to the Schedule E filed for each year, earned "income in the mid to upper six figures from BioC" in 2012, 2013, and 2014.[4] Appellant's App. Vol. 2 at 67. In support of her contention on appeal, Wife directs us to only two pages of the transcript from

---

[3] Petitioner's Exhibit 57 is the Schedule K-1 that Wife filed for the 2015 tax year. That document shows that Wife reported "Self-employment earnings" of $885,789. Petitioner's Ex. 57 at 1.

[4] For example, on Schedule E for Wife's 2012 tax returns, her "Total income" is listed as $629,749. Petitioner's Ex. 50 at 13.

the final hearing where she stated that she was "not very familiar with tax returns" and that she thought she got "around [$115,000] gross in guaranteed payment before taxes" in 2012. Tr. Vol. 5 at 241-42. But the trial court, as the factfinder, was entitled to weigh or disregard that testimony. *See Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017) ("'The factfinder is obliged to determine not only whom to believe, but also what portions of conflicting testimony to believe, and is not required to believe a witness'[s] testimony even when it is uncontradicted.'"). And Wife presented no evidence to contradict the trial court's findings regarding her tax returns for 2013 through 2015.

[23] Still, Wife directs us to her testimony from the March 7, 2017, consolidated hearing on her motion to stay execution of the judgment and request for an appeal bond and on Husband's motion to correct error, in which Husband had alleged that the court erred when it did not award him a security interest in BioC. At that hearing, Wife testified that she has "never made more than" $117,000 per year in income from BioC. Tr. Add. at 33. But Wife did not ask the trial court to consider that evidence in connection with a challenge to the attorney's fee award. Rather, Wife's counsel stated that "that testimony goes to the appeal bond."[5] *Id.* at 16. In any event, again, the trial court was entitled to weigh or disregard that testimony. *See Perry*, 78 N.E.3d at 8.

---

[5] We note that, in a footnote in her reply brief, Wife states that "the reason for [Wife's] testimony on that issue was to afford the Trial Court the opportunity to correct the obvious error." Reply Br. at 15 n.6. But the transcript is clear—Wife did not ask the trial court to reconsider the attorney's fee award at any time after the final decree.

Finally, in her reply brief, Wife asserts that the trial court "misappli[ed the] notion of 'attributed' or 'pass-through' income," which resulted in "a failure to properly evaluate the legal ramifications of an admittedly nuanced taxation subject."[6] Reply Br. at 15-16. Wife goes on to explain that,

> [c]ertain business formations are required to allocate business income to the owners as a "pass-through." The treatment of this pass-through, or undistributed, income is a matter of policy. Indiana has previously found that [a] minority shareholder's pass-through income of a closely held corporation, which did not increase actual income of husband should not have been included in [the] calculation of husband's child support obligations. Other states have determined that undistributed income from a closely-held corporation should not be calculated as "income" for purposes of dissolution[] proceedings and calculating child support and alimony. This is appropriate because the owner of the closely-held corporation does not actually receive the benefit of the "income" attributed to her.
>
> Ultimately, the extent to which a trial court can impute undistributed income to a spouse for purposes of an attorney's fee award appears to be a matter of first impression in Indiana. This Court should adopt the position that the undistributed income should not be considered when determining the propriety of attorney's fees.

*Id.* at 16-17 (citations omitted).

---

[6] Wife made this argument for the first time in her reply brief, but it was in response to argument Husband made in his appellee's brief. *See* Ind. Appellate Rule 46(C).

[25]     We understand the distinction that Wife attempts to make on appeal between guaranteed payments and distributions and "self-employment earnings," which can include undistributed income. In a pass-through entity, a Schedule K-1 may include ordinary business income that is undistributed but is nevertheless attributed to a member according to her percentage of ownership. This is often called phantom income. In a pass-through entity, while there are no "retained earnings" as such, the business may retain undistributed and previously taxed income for various reasons. And in a closely held, pass-through entity such as BioC, depending upon the components, the majority owner may determine how much of that undistributed previously taxed income will be paid or distributed. In sum, without further evidence, there is no reliable or readily apparent correlation between guaranteed payments and distributions on the one hand and actual earnings and profit on the other.

[26]     Wife asks that we disregard any undistributed income when determining the propriety of the attorney's fee award because, she contends, the owner of a closely held, pass-through entity does not actually receive the benefit of the "income" attributed to her. We observe, however, that Wife did not offer any explanation or evidence of the underlying accounting or the components which comprise her self-employment earnings. Thus, the only evidence of Wife's income for purposes of the attorney's fee award in the final decree was her tax returns and her brief testimony at the final hearing regarding her "guaranteed payment" in 2012. Wife invites us to adopt the position that undistributed income should not be considered when determining the propriety of attorney's

fees, but the record is wholly inadequate for us to address that issue. Even if it were error for the trial court to rely on undistributed income in charging Wife with a portion of husband's attorney's fees, that error would be attributable to Wife for having neglected to explain her self-employment earnings. *See, e.g.*, *Nowels v. Nowels*, 836 N.E.2d 481, 489 (Ind. Ct. App. 2005) (affirming trial court's child support calculation where Father did not present evidence of "an alternative calculation specifying the amount of pass-through income" he received as a minority shareholder of an S-corporation).

[27] Wife argues on appeal that the trial court failed to "properly evaluate the legal ramifications" of her tax returns, but wife failed to present any evidence or testimony that might have enabled the court to give more weight to her interpretation of this "nuanced tax subject." And, to the extent Wife contends that the trial court mischaracterized her income, we note that the trial court made no findings regarding the distributions Wife received but, instead, limited its findings to what the 2015 Schedule K-1 showed to be her "self-employment earnings" and what Schedule E for the years 2012 through 2014 showed to be "income." Finally, and significantly, the trial court did not rely entirely on Wife's tax returns or any other single factor in making the attorney's fee award, but on several distinct factors enumerated in its findings and conclusions. *See* Appellant's App. Vol. 2 at 67. Wife has not demonstrated error.

*Tax Deduction and Illiquidity*

[28]     Likewise, Wife does not direct us to evidence before the trial court to support her contention and three-sentence argument that the court "took into account an improper tax deduction."[7]  Appellant's Br. at 25.  And we reject Wife's contention that the trial court took "no account of the illiquidity of [Wife]'s share of the marital assets."  *Id.* at 26.  In support of that contention, Wife cites to the trial court's order granting Husband's motion to correct error.  But that order had nothing to do with the attorney's fee award the court had included in the final decree issued months earlier.  Finally, we reject Wife's assertion that, because her attorney's fees of some $1.1 million "were nearly three (3) times that of [Husband's]," the trial court should have ordered Husband to pay "a substantial portion" of Wife's attorney's fees.  *Id.*

[29]     In sum, Wife has not demonstrated that the attorney's fee award is unsupported by the record.  Again, we do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.  *Masters*, 43 N.E.3d at 577.  Wife has not satisfied her burden to show that the trial court erred when it ordered her to pay $120,000 of Husband's attorney's fees.

--------

[7]  The trial court found that Wife has enjoyed the tax loss benefit of operating loss carryforwards from previous years that have sheltered her income from taxation in recent years.  Wife does not direct us to any evidence to show that that finding is erroneous.

## *Conclusion*

Again, we disturb the trial court's judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Trabucco*, 944 N.E.2d at 549. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. *Id.* Here, the evidence supports the findings and the findings support the judgment. And the trial court relied on a correct legal standard with respect to Wife's claims on appeal. *See id.*

Thus, we hold that the trial court did not err when it divided the marital property. The trial court did not err when it awarded Husband a security interest in Wife's equity in BioC. And the trial court did not err when it ordered Wife to pay $120,000 of Husband's attorney's fees.

Affirmed.

Kirsch, J., and Brown, J., concur.